**UTAH ASSOCIATION OF COUNTIES, on behalf of its members Plaintiffs,**

v.

**George W. BUSH, in his official capacity as President of the United States, et al., Defendants.**

**and**

**Southern Utah Wilderness Alliance, et al., Defendants–Intervenors.**

**Mountain States Legal Foundation, on behalf of its members Plaintiffs,**

v.

**George W. Bush, in his official capacity as President of the United States, et al., Defendants.**

**and**

**Southern Utah Wilderness Alliance, et al., Defendants–Intervenors.**

**Nos. 2:97 CV 0479, 2:97 CV 0863.**

United States District Court, D. Utah, Central Division.

April 19, 2004.

Ronald W. Thompson, Stephen H. Urquhart, Thompson Awerkamp & Urquhart LC, St. George, UT, Constance E. Brooks, Michael B. Marinovich, CE Brooks & Associates, Denver, CO, Steven J. Christiansen, Parr Waddoups Brown Gee & Loveless, Salt Lake City, William Perry Pendley, Todd S. Welch, S. Amanda Koehler, Mountain States Legal Foundation, Lakewood, CO, for Plaintiffs.

Carlie Christensen, U.S. Attorney's Office, Gary B. Randall, U.S. Department of Justice Environmental & Natural Resources Div., Washington, DC, Ann Navaro, Department of Justice, Lois J. Schiffer, U.S. Department of Justice Environment & Natural Resources Division, Washington, DC, Michael A. Gheleta, Department of Justice, Denver, CO, for Defendants.

Rodney R. Parker, Snow Christensen & Martineau, Heidi J. McIntosh, Stephen H. Bloch, Southern Utah Wilderness Alliance, Salt Lake City, UT, William L. Underwood, Richard A. Duncan, Craig S. Coleman, Faegre & Benson, Minneapolis, MN, Karleen M. O'Connor, Faegre & Benson, Minneapolis, MN, for Defendants-Intervenors.

## OPINION AND ORDER

BENSON, District Judge.

### INTRODUCTION

The present matter comes before the Court on defendants' Motion to Dismiss or in the alternative for Summary Judgment and plaintiffs' Motions for Summary Judgment. The motions were argued before the Court on January 15, 2004. The Court has considered the legal briefs and oral arguments of the respective parties and enters the following Opinion and Order.

## BACKGROUND

### A. THE LAWSUITS AND THEIR CONTENTIONS

On September 18, 1996, President William Jefferson Clinton, invoking his authority under the Antiquities Act, designated 1.7 million acres of federal land in southeastern Utah as the Grand Staircase-Escalante National Monument. On June 23, 1997, the Utah Association of Counties, (UAC) filed this lawsuit challenging the President's actions, naming as defendants the United States of America, William J. Clinton in his official capacity as President of the United States, Kathleen McGinty in her official capacity as chair of the Council on Environmental Quality (CEQ), Secretary of the Interior Bruce Babbitt, the United States Department of the Interior (DOI), and Patrick Shea, Director of the Bureau of Land Management (BLM).

On November 5, 1997 Mountain States Legal Foundation (MSLF) filed a similar suit against defendants Clinton, Babbitt, and the United States of America. A month later, MSLF filed an amended complaint, which added defendant McGinty. UAC's and MSLF's cases were consolidated.[1]

Plaintiffs allege:

1) The Antiquities Act is unconstitutional because it violates the delegation doctrine. Plaintiffs claim that only Congress has the authority to withdraw such lands from the federal trust.

2) By creating the Grand Staircase Monument the President acted *ultra vires* and violated the following provisions of the United States Constitution:

a) the Property Clause, U.S. Const., Art. IV, § 3, cl. 2; because the authority to

---

1. Pursuant to Federal Rules of Civil Procedure 25(d)(1), defendants have since been substituted to reflect a presidential and administration change. Current individual defendants are now President George W. Bush; CEQ Chair James L. Connaughton; Department of the Interior Secretary Gale Norton and Bureau of Land Management Director Kathleen Clarke.

manage federal lands rests exclusively with Congress; and

b) the Spending Clause, U.S. Const., Art. I, § 8, cl. 1; because only Congress has the authority to obligate money which will be drawn from the Treasury to purchase private property.

3) By creating the Grand Staircase Monument the President violated:

a) the Antiquities Act, 16 U.S.C. § 431; because he failed to designate the requisite objects of historic or scientific value and he did not limit the size of the monument to the "smallest area" necessary to preserve the objects.

b) the Wilderness Act, 16 U.S.C.A. § 1131 *et seq.;* because the President established as *de facto* wilderness areas within the Grand Staircase Monument, and only Congress has the authority to designate public lands as wilderness.

c) Executive Order 10355, because the President, rather than the Secretary of the Interior, withdrew the land.

4) By creating the Grand Staircase Monument the President and/or one or more of the other defendants violated:

a) the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 *et seq;* because the joint activities of the Department of the Interior and CEQ were carried out independently of the President and were in fact initiated by DOI, and therefore these actions required the preparation of an Environmental Impact State-ment (EIS) and compliance with other NEPA regulations, which did not happen.

b) the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.;* because the President's withdrawal of public lands did not comply with FLPMA's withdrawal, notice and land use planning provisions.

c) the Federal Advisory Committee Act (FACA), 5 U.S.C. app 2; because advice and recommendations were received by the President and other defendants from various individuals who constituted an "advisory committee" within the meaning of FACA and therefore required compliance with FACA's procedural standards.

d) The Anti–Deficiency Act, 31 U.S.C. § 1341; because an improper appropriation was created.

Both plaintiffs seek summary judgment as to all of the above claims.

All of the defendants seek dismissal or in the alternative summary judgment as to all claims. They challenge the Court's jurisdiction to hear the case under the doctrines of standing (as to MSLF only), ripeness and lack of judicial review authority. As to the plaintiffs' claims of violations of the United States Constitution and federal statutes, the defendants seek dismissal as a matter of law.

## 1. THE ANTIQUITIES ACT

The Antiquities Act of 1906, 16 U.S.C. § 431, gives the President authority to create national monuments.[2] Since its en-

---

**2.** The full text of the Act reads as follows:

> The President of the United States is authorized, in his discretion, to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments, and may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected. When such objects are situated upon a tract covered by a bona fide unperfected claim or held in private ownership, the tract, or so much thereof as may be necessary for the proper care and management of the object, may be relinquished to the Government, and the Secretary of the Interior is authorized to accept the

actment, presidents have used the Antiquities Act more than 100 times to withdraw lands from the public domain as national monuments. President Clinton's use of the Antiquities Act to create the Grand Staircase Monument in 1996 was the first use of the Antiquities Act in more than two decades. The Antiquities Act authorizes the President, "in his discretion," to establish as national monuments "objects of historic or scientific interest that are situated upon the lands owned or controlled by the government of the United States." *Id.* The Act requires the president to reserve land confined to the "smallest area compatible with the proper care and management of the objects to be protected." *Id.* For purposes of this litigation, it is helpful to look to the creation of the Act and how it has been used and interpreted since its creation in 1906.

The original purpose of the proposed Act was to protect objects of antiquity.[3] The substance of the Act, developed over a period of more than six years, was created in response to the demands of archaeological organizations. Although the scope of the archaeological organizations' proposals was limited to preservation of antiquities on federal lands, the United States Department of the Interior proposed adding the protection of scenic and scientific resources to the Act. For six years Congress rejected attempts to include the Department's proposal. It appears, however, that Congress was unable to pass the limited archaeologists' bill because of bureaucratic delays and various disagreements between museums and universities seeking

authority to excavate ruins on public lands. *See* Richard M. Johannsen, *Public Land Withdrawal Policy and the Antiquities Act,* 56 Wash. L.Rev. 439, 448 (1981).

Edgar Lee Hewitt, a prominent archaeologist, drafted the bill that was finally enacted in 1906. Government officials persuaded Hewitt to broaden the scope of his draft by including the phrase "other objects of historic or scientific interest." This phrase essentially allowed the Department of the Interior's proposal, which Congress had previously rejected, to be included in the final bill. In addition, while earlier proposals had limited the reservations to 320 or at the most 640 acres, Hewitt's draft allowed the limit to be set according to "the smallest area compatible with the proper care and management of the objects to be protected." Despite the presence of this broader language, there is some support for the proposition that Congress intended to limit the creation of national monuments to small land areas surrounding specific objects. Illustrative of this intent is House Report No. 2224, which states "[t]here are scattered throughout the southwest quite a large number of very interesting ruins ... [t]he bill proposes to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics." H.R. REP. NO. 2224, 59TH CONGRESS, 1ST SESS. at 1 (1906).

Despite what may have been the intent of some members of Congress, use of the Antiquities Act has clearly expanded beyond the protection of antiquities and

---

relinquishment of such tracts in behalf of the Government of the United States.

16 U.S.C. § 431 (1976).

**3.** The phrase "objects of antiquity," while not in § 431 but found in § 433, has commonly been interpreted to include such items as paleontological and archaeological artifacts. When interpreting its precise meaning, however, courts have disagreed with the adequacy

of the phrase. *See e.g., U.S. v. Diaz,* 499 F.2d 113, 114–5 (9th Cir.1974) (finding that the phrase "objects of antiquity" was "fatally vague in violation of the due process clause of the Constitution."); *but see U.S. v. Smyer,* 596 F.2d 939, 941 (10th Cir.1979) (holding that "when measured by common understanding and practice," the phrase was sufficiently definite to define the protected object).

"small reservations" of "interesting ruins." Nothing in the language of the Act specifically authorizes the creation of national monuments for scenic purposes or for general conservation purposes. Nonetheless, several presidents have used the Act to withdraw large land areas for scenic and general conservation purposes. President Theodore Roosevelt was the first president to withdraw land under the Act, establishing a precedent other presidents later followed to create large scenic monuments. Within two years of enactment of the Act, President Roosevelt made eighteen withdrawals of land.[4]

Several monuments have been created within the general vicinity of the Grand Staircase Monument. In Utah alone, there are six such national monuments: Cedar Breaks, Hovenweep, Timpanogos Cave, Dinosaur, Rainbow Bridge, and Natural Bridges. Surrounding areas in Colorado and Arizona have also been designated as monuments under the Antiquities Act. Presidential proclamations creating these monuments cited geologic, paleontologic, archaeologic, and other features similar to those in the Grand Staircase Monument proclamation. Zion National Park to the west of the Grand Staircase Monument was originally Mukuntuweap National Monument, created by President Taft in 1909 to protect its "many natural features of unusual archaeologic, geologic, and geographic interest." See Proclamation No. 877, 36 Stat. 2498. President Wilson enlarged the boundaries of the monument in 1918 and Congress converted it to a national park in 1919.

President Hoover established Utah's Arches National Monument to the northeast of the Grand Staircase Monument in 1929, citing its "unique wind-worn sandstone formation, the preservation of which is desirable because of their educational and scenic value." Proclamation No. 1875, 46 Stat. 2988. Congress designated Arches a National Park in 1971. President Franklin D. Roosevelt established Utah's Cedar Breaks National Monument, located west of the Grand Staircase Monument, in 1933 (Proclamation No.2054, 48 stat. 1705.), and Capital Reef National Monument, which is located to the immediate east of the Grand Staircase Monument, in 1938. (Proclamation No. 2246, 50 Stat. 1856.)

Coincidentally, during the 1930s, the Franklin D. Roosevelt administration considered the creation of a monument in virtually the same area as the Grand Staircase Monument. President Roosevelt received a recommendation to withdraw 4.4. million acres of Utah's red rock country, creating Escalante National Monument. The Roosevelt administration ultimately rejected the idea, in large part because of local opposition. *See* James R. Rasband, *Utah's Grand Staircase: The Right Path to Wilderness Preservation?*, 70 U. COLO. L. REV. 483, 488 (1999).

Most of the presidential withdrawals have been uncontroversial. However, there have been several legal challenges to presidential monument designations under the Antiquities Act. Every challenge to date has been unsuccessful. *See Cameron*

---

4. The national monuments created by President Theodore Roosevelt:

| | |
|---|---|
| 9/24/06 | Devils Tower, WY |
| 12/8/06 | El Morro, NM |
| 12/8/06 | Montezuma Castle, AZ |
| 12/8/06 | Petrified Forest, AZ |
| 3/11/07 | Chaco Canyon, NM |
| 5/6/07 | Cinder Cone, CA |
| 5/6/07 | Lassen Peak, CA |
| 11/16/07 | Gila Cliff Dwellings, NM |
| 12/19/07 | Tonto, AZ |
| 1/9/08 | Muir Woods, CA |
| 1/11/08 | Grand Canyon, AZ |
| 1/16/08 | Pinnacles, CA |
| 2/7/08 | Jewel Cave, SD |
| 4/16/08 | Natural Bridges, UT |
| 5/11/08 | Lewis and Clark Cavern, MT |
| 9/15/08 | Tumacacori, AZ |
| 12/7/08 | Wheeler, CO |
| 3/2/09 | Mount Olympus, WA |

*v. United States*, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920) (the President's designation of the Grand Canyon as a national monument was a valid use of his authority under the Antiquities Act); *Wyoming v. Franke*, 58 F.Supp. 890 (D.Wyo. 1945) (the proclamation creating the Jackson Hole National Monument complied with the standards set forth in the Antiquities Act); *Cappaert v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976) (presidential proclamation withdrawing the Devil's Hole tract of land and accompanying water from the public domain and combining it with the Death Valley National Monument, explicitly reserved water rights to the federal Government and constituted a valid exercise of presidential authority under the Antiquities Act); *Anaconda Copper Co. v. Andrus*, No. A79–101 (D.Alaska, 1980); *Alaska v. Carter*, 462 F.Supp. 1155 (D.Alaska 1978) (president not subject to requirements of National Environmental Policy Act when proclaiming national monuments under the Antiquities Act).

## 2. THE WILDERNESS ACT

Also relevant to the present motions is the Wilderness Act, 16 U.S.C. §§ 1131–36 (1964). The Wilderness Act, signed into law in 1964, was intended to preserve the undeveloped character of designated areas. Prior to passage of the Wilderness Act, the United States Forest Service and the United States National Park Service were the only two federal agencies with a management scheme to preserve wilderness areas. Selection and management of the lands was discretionary. Concerned that some areas were not receiving the necessary protection and perhaps that some were receiving too much, Congress created a means by which a system of wilderness could be created that would provide the appropriate safeguards and that designated Congress alone as the final arbiter of which federal lands would actually achieve status as wilderness areas. *See* Leann Foster, *Wildlands and System Values: Our Legal Accountability to Wilderness*, 22 Vt. L. Rev. 917, 921–22 (1998).

The Wilderness Act directed the Secretary of Agriculture and the Secretary of the Interior to review certain lands within their jurisdictions and make recommendations as to their suitability for wilderness classification. *See id.* § 1132(d)(1). The areas to be studied were identified as Wilderness Study Areas (WSAs). *See id.* § 1131. Once the lands were inventoried, BLM was to conduct a study of each WSA, pursuant to Section 603 of FLPMA, 43 U.S.C. § 1782. The BLM would then make a recommendation to the President, who in turn would recommend to Congress whether any of the WSAs should be designated as wilderness. Until such designation occurs, the administering agency is to manage the WSAs so as not to impair their suitability for possible wilderness classification by Congress. *See* 16 U.S.C. § 1133. Once an area receives actual wilderness status, commercial enterprises, roads, motorized equipment, mining, and oil and gas leasing are prohibited in the wilderness area. *See id.*

Approximately 900,000 acres, roughly one-half of the acreage within the Grand Staircase Monument, are classified as WSAs and therefore preserved for suitability for possible future preservation as wilderness. Congress has not made a final determination with regard to the WSAs within the Grand Staircase Monument.

## 3. EVENTS LEADING TO THE GRAND STAIRCASE PROCLAMATION

From 1978 to 1991, the BLM conducted various studies which resulted in a recommendation that 1.9 million acres of WSAs in the state of Utah should receive wilderness designation. This recommendation,

which included some of the land now part of the Grand Staircase Monument, was forwarded by then Secretary of the Interior Manuel Lujan to President George H.W. Bush in October, 1991. The recommendation was supported by a final EIS, and more than 11 years of BLM evaluation and public involvement. However, a change in presidential administrations in 1992 ended discussion about the proposed designation.

Regarding Utah wilderness, the new Secretary of the Interior, Bruce Babbitt, disagreed with the recommendations of his predecessor, believing significantly more land should be set aside. In 1994, then BLM Director Jim Baca wrote to an environmental group stating that the 1.9 million acre wilderness recommendation made by former Interior Secretary Lujan was "off the table." However, Secretary Babbitt's ability to undertake a new wilderness study pursuant to Section 603 of FLPMA had expired. Nevertheless, Secretary Babbitt testified before Congress on several occasions, urging that a considerable number of additional wilderness areas should be designated in Utah. Consequently, the 104th Congress (1995–96) considered several different Utah wilderness bills, including a bill sponsored by members of Utah's congressional delegation which would designate about two million additional acres of wilderness, which was essentially the same as the previous recommendation from former Secretary Lujan. Also under consideration was a bill sponsored by Congressman Hinchey of New York and supported by national and Utah environmental groups. The Hinchey bill sought to designate 5.7 million acres of

wilderness in Utah. Neither bill reached the floor of the House, and a filibuster precluded a vote in the Senate. Thereafter, Secretary Babbitt directed a second wilderness inventory, the Utah Wilderness Review, in hopes of showing that Congressman Hinchey's proposed 5.7 million acres bill warranted passage. This Utah Wilderness Review included the evaluation of the wilderness characteristics of approximately 800,000 acres of public land now part of the Grand Staircase Monument. Eventually, however, Secretary Babbitt's efforts, along with all other efforts made by those in Congress to establish wilderness in the state of Utah, were unsuccessful.

Plaintiffs contend in this litigation that the lack of success in the effort to designate additional wilderness areas in Utah was a motivating factor behind the President's decision to designate the Grand Staircase Monument. Once the proclamation was announced the affected land was preserved in much the same manner as if it had received wilderness designation.

Plaintiffs assert, and the record appears to support, that another driving force behind Secretary Babbitt's, the DOI's, and eventually the President's efforts to create the Grand Staircase Monument was to prevent the proposed Andalex Smoky Hollow coal mining operation in Kane County, Utah from coming to fruition.[5] Besides supporting Congressman Hinchey's proposed wilderness designation, which would encompass the property proposed for the Smoky Hollow Mine, Secretary Babbitt and the DOI also attacked the validity of the federal Smoky Hollow coal leases by

---

**5.** The Andalex Smoky Hollow coal mine was designed as an underground mine, affecting approximately 60 acres of surface space, to be located on property that is part of the Kaiparaowits coal field. The Kaiparowits coal field is estimated by the Utah Geological Survey to contain 62.3 billion tons of coal, of which at least 11.3 billion tons could be recovered. The estimated total federal royalty payments over time from full production of Kaiparowits coal are approximately $20 billion, and the State of Utah and Utah counties would have been entitled to 50% of that amount under the Mineral Leasing Act.

attempting to cancel the suspension in the interest of conservation granted to the holders of the coal leases several years earlier by the Utah BLM State Director. The suspension was originally granted to allow Andalex sufficient time to secure mining permits and complete preparation of an EIS.

From the exhibits submitted by plaintiffs, the majority of which were secured by congressional subpoena, it appears that in early 1996, efforts involving various officials within the executive branch of government began discussing the possibility of creating a national monument in Utah by way of a presidential proclamation. Internal memoranda indicate that as early as March 1996, the DOI requested that CEQ or White House officials send a letter to Secretary Babbitt under the President's signature requesting an investigation and recommendations for a Utah national monument. Plaintiffs assert that the reasoning behind the request was to enable defendants to avoid having to comply with NEPA and FLPMA, because the President is not a federal agency and not subject to either NEPA or FLPMA. An internal CEQ memorandum from Ms. McGinty to Todd Stern reveals even broader reasoning behind the request that the President sign a letter to be sent to Secretary Babbitt:

the president will do the utah event on Aug. 17. however, we still need to get the letter (from the President to Interior Secretary Babbitt) signed asap. the reason: under the antiquities act, we need to build a credible record that will withstand legal challenge that: (1) the president asked the secretary to look into these lands to see if they are of important scientific, cultural, or historic value; (2) the secy undertook that review and presented the results to the president; (3) the president found the review compelling and therefore exercised his authority under the antiquities

act. presidential actions under this act have always been challenged, they have never been struck down, however. so, letter needs to be signed asap so that secy has what looks like a credible amount of time to do his investigation of the matter. we have opened the letter with a sentence that gives us some more room by making it clear that the president and babbitt had discussed this some time ago. [sic] (McGinty, e-mail to Todd Stern, July 29, 1996).

Plaintiffs allege that no such letter was sent to Secretary Babbitt.

From March 1996 to September 18, 1996, DOI officials worked closely with CEQ Director Kathleen McGinty and others to identify the lands to include in the proclamation and the actions needed to ensure that the proclamation would survive judicial scrutiny. In August 1996, the DOI conducted a database and bibliography search to prepare a record to support the proclamation. Some of the reasons for creating Grand Staircase Monument focused on the proposed Smoky Hollow coal mine and contentions that the mine would irreversibly damage the environment and Utah's public lands. These contentions, plaintiffs allege, were contradicted by the BLM's draft EIS.

Following this history, the Proclamation itself took place on September 18, 1996, when President Clinton stood at the south rim of the Grand Canyon in Arizona and announced the establishment of the 1.7 million acre Utah monument. There was virtually no advance consultation with Utah's federal or state officials, which may explain the decision to make the announcement in Arizona. The monument created a good deal of controversy, heightened even more because the presidential election was less than 8 weeks away. In making the announcement, President Clinton emphasized his "concern[ ] about a large

coal mine proposed for the area" and his belief that "we shouldn't have mines that threaten our national treasures." *Remarks Announcing the Establishment of the Grand Staircase–Escalate National Monument*, 32 Weekly Comp. Pres. Doc. 1785 (Sept. 23, 1996).

In the written Proclamation, President Clinton cited "geologic treasures" as the initial reason for creation of the monument. *See* Proclamation No. 6920, 61 Fed.Reg. 50,223 (1996). Specifically, the President noted "sedimentary rock layers ... offering a clear view to understanding the processes of the earth's formation" and "in addition to several major arches and natural bridges, vivid geological features are laid bare in narrow, serpentine canyons, where erosion has exposed sandstone and shale deposits in shades of red, maroon, chocolate, tan, gray, and white. Such diverse objects make the monument outstanding for purposes of geologic study." *Id.* Secondly, the President cited "world class paleontological sites" as grounds for the Proclamation. *Id.* According to the President, those things in need of protection consisted of "remarkable specimens of petrified wood" and "significant fossils, including marine and brackish water mollusks, turtles, crocodilians, lizards, dinosaurs, fishes, and mammals...." *Id.* Archeological interests in "Anasazi and Fremont cultures" were also said to be "of significant scientific and historic value worthy of preservation for future study." *Id.* Finally, the President mentioned the "spectacular array of unusual and diverse soils," "cryptobiotic crusts," and the "many different vegetative communities and numerous types of endemic plants and their pollinators" as warranting protection since "[m]ost of the ecological communities contained in the monument have low resistance to, and slow recovery from, disturbance." *Id.*

The President's Proclamation designating the monument required that the BLM prepare an approved Monument Management Plan no later than September 18, 1999. The approved Management Plan did not make the September deadline, but was finally approved on February 28, 2000. Since approval of the Monument Management Plan the BLM has been responsible for management of the Grand Staircase Monument.

## 4. SUMMARY OF OPINION

The record is undisputed that the President of the United States used his authority under the Antiquities Act to designate the Grand Staircase Monument. The record is also undisputed that in doing so the President complied with the Antiquities Act's two requirements, 1) designating, in his discretion, objects of scientific or historic value, and 2) setting aside, in his discretion, the smallest area necessary to protect the objects. With little additional discussion, these facts compel a finding in favor of the President's actions in creating the monument. That is essentially the end of the legal analysis. Clearly established Supreme Court precedent instructs that the Court's judicial review in these circumstances is at best limited to ascertaining that the President in fact invoked his powers under the Antiquities Act. Beyond such a facial review the Court is not permitted to go. *Dalton v. Specter*, 511 U.S. 462, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994); *Franklin v. Massachusetts*, 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). When the President is given such a broad grant of discretion as in the Antiquities Act, the courts have no authority to determine whether the President abused his discretion. See *United States v. George S. Bush & Co., Inc.*, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940). To do so would impermissibly replace the

President's discretion with that of the judiciary.

■ This Court has the authority to review whether the President's actions violated the United States Constitution or another federal statute, such as the Wilderness Act. See *Franklin v. Massachusetts*, 505 U.S. at 801, 112 S.Ct. 2767; see also *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); and *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C.Cir.1996). In the present case plaintiffs' constitutional and statutory claims are without factual or legal support. Congress clearly had the authority to pass the Antiquities Act of 1906. It is a proper constitutional grant of authority to the President. The Act itself, and the President's designations pursuant to the Act, are not inconsistent with the Constitution's Property Clause, Spending Clause, or the delegation doctrine; nor is the President's Proclamation in violation of the Wilderness Act or any other federal statute. No statute passed after the Antiquities Act has repealed or amended the Antiquities Act. It stands as valid law. Only Congress has the power to change or revoke the Antiquities Act's grant of virtually unlimited discretion to the President.

As for plaintiffs' myriad claims based on NEPA, FLPMA, FACA and the Anti–Deficiency Act, they too are of no merit. These statutes do not provide for a private right of action. The only way parties such as the plaintiffs here may complain of a violation of these statutes is through the Administrative Procedure Act (APA), which requires a finding of final agency action. Here, there is no such final agency action. The President is not an agency, and the record is undisputed that the actions of the other defendants were only assisting the President in the execution of his discretion under the Antiquities Act.

Plaintiffs' claim that the President's designation of the Grand Staircase Monument violates the Wilderness Act is unavailing. Although a significant percentage of the land in the Grand Staircase Monument may qualify as wilderness under the Wilderness Act, the President did not designate wilderness; he designated a national monument. While the Antiquities Act and the Wilderness Act in certain respects may provide overlapping sources of protection, such overlap is neither novel nor illegal, and in no way renders the President's actions invalid.

■ Executive Order 10355, adopted by the Executive Branch in 1952, did not eliminate the President's withdrawal authority under the Antiquities Act. The President has no law-making authority. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. at 587, 72 S.Ct. 863. The use of executive orders may be employed by the President in carrying out his constitutional obligation to see that the laws are faithfully executed and to delegate certain of his duties to other executive branch officials, but an executive order cannot impose legal requirements on the executive branch that are inconsistent with the express will of Congress. Executive Order 10355 by its express terms does not eliminate the President's authority, as granted specifically to the President by Congress. Furthermore, by specifically exempting the Antiquities Act from the reach of FLPMA in 1976, for example, Congress reaffirmed that the Antiquities Act was to continue to not be subjected to requirements that must be followed by lower-level executive officials. Whatever else may by said about the possible reach of Executive Order 10355, it is undisputed that since its passage in 1952 there have been 20 presidential proclamations creating national monuments and none have transferred the exercise of withdrawal authority to the Secretary of the Interior.

## B. DISCUSSION

### 1. JUDICIAL REVIEW [6]

Plaintiffs seek a searching review by this court of the President's actions in creating the Grand Staircase Monument. Both plaintiffs claim the proclamation was *ultra vires* and unconstitutional. MSLF seeks a further determination that the President abused his discretion, asking in particular for a finding that the President violated the Antiquities Act by a) not properly designating objects of scientific or historic value, b) setting aside too much property, and c) using the Act for improper purposes, such as stopping a local coal mining operation and improperly creating wilderness areas. In conducting such a sweeping judicial review, the plaintiffs seek an interpretation of the Antiquities Act that requires a comprehensive examination of the Act's legislative history. The extensive judicial review sought by the plaintiffs is, however, not available in this case.

■ While there has been some debate among the United States Supreme Court justices as to whether judicial review of

executive actions by the President are subject to judicial review at all,[7] recent judgments have indicated the Court's willingness to engage in a narrowly circumscribed form of judicial review. This willingness does not, however, allow judicial review of sufficient scope to assist plaintiffs' cause; long-standing United States Supreme Court precedent has clearly foreclosed the broad review for which plaintiffs contend:

"Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts." For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains.

*United States v. George S. Bush & Co.*, 310 U.S. 371, 380, 60 S.Ct. 944, 84 L.Ed. 1259 (1940) (quoting *Martin v. Mott*, 25 U.S. 19, 12 Wheat. 19, 31–32, 6 L.Ed. 537 (1827)). A grant of discretion to the President to make particular judgments forecloses judicial review of the substance of those judgments altogether:

6. With respect to the issue of standing to sue, the United States concedes that UAC has standing, but insists MSLF does not. The requirements for an initial showing sufficient to support standing in a case of this nature are relatively lenient, as set forth in *Utah v. Babbitt*, 137 F.3d 1193 (10th Cir.1998), *Colorado Environmental Coalition v. Wenker*, 353 F.3d 1221 (10th Cir.2004) and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Given this relatively light burden at the present stage of the instant case and recognizing that many of the claims of UAC and MSLF are identical or similar, and in the interest of judicial economy the Court will not further address the standing question in this Opinion. While not expressly finding that MSLF has standing to sue, the Court will address all of the parties' claims, including those advanced solely by MSLF.

7. Justice Scalia's concurrence in *Franklin v. Massachusetts* articulates the most restrictive approach possible to the question of whether judicial review of the President's actions is permissible:

I think we cannot issue a declaratory judgment against the President. It is incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court.

505 U.S. 788, 827 (1992). In this formulation, presidential action can be reviewed by seeking an injunction against those bound to enforce a President's directive, but the possibility of direct judicial review of the President's decision, for which plaintiffs contend, is eliminated altogether as inconsistent with "the constitutional tradition of the separation of powers." *Id.* at 828, 112 S.Ct. 2767.

[W]here a claim "concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power. This must be since, as this court has often pointed out, the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion."

*Dalton v. Specter*, 511 U.S. 462, 474, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994) (quoting *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184, 39 S.Ct. 507, 63 L.Ed. 910 (1919)).

■ If a Court may not review the President's judgment as to the existence of the facts on which his discretionary judgment is based, the holdings in *Dalton* and *George S. Bush* do leave open one avenue of judicial inquiry. Although judicial review is not available to assess a particular exercise of presidential discretion, a Court may ensure that a president was in fact exercising the authority conferred by the act at issue. Thus, although this Court is without jurisdiction to second-guess the reasons underlying the President's designation of a particular monument, the Court may still inquire into whether the President, when designating this Monument, acted pursuant to the Antiquities Act.

■ The Antiquities Act offers two principles to guide the President in making a designation under the Act:

The President of the United States is authorized, in his discretion, to declare by public proclamation ... objects of historic or scientific interest ... to be national monuments, and may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

16 U.S.C. § 431. The Proclamation of which plaintiffs complain speaks in detail of the Monument's natural and archeological resources and indicates that the designated area is the smallest consistent with the protection of those resources. The language of the Proclamation clearly indicates that the President considered the principles that Congress required him to consider: he used his discretion in designating objects of scientific or historic value, and used his discretion in setting aside the smallest area necessary to protect those objects.

It is evident from the language of the Proclamation that the President exercised the discretion lawfully delegated to him by Congress under the Antiquities Act, and that finding demarcates the outer limit of judicial review. Whether the President's designation best fulfilled the general congressional intention embodied in the Antiquities Act is not a matter for judicial inquiry. This Court declines plaintiffs' invitation to substitute its judgment for that of the President, particularly in an arena in which the congressional intent most clearly manifest is an intention to delegate decision-making to the sound discretion of the President.[8]

---

8. Plaintiffs devote considerable space in their Memorandum in Support of their Motion for Summary Judgment to a discussion of congressional intent and the evidence for it. According to plaintiffs, the legislative history surrounding the passage of the Antiquities Act demonstrates that Congress intended the Act be used to protect man-made objects only, and was not intended to be available as a means for furthering presidential environmental agendas. (Plaintiffs' Combined Memo at 17 *et seq.*) Excerpts from floor debates before the Act's passage are also enlisted to prove that the Act was only intended to allow the President to withdraw very small plots of land to protect the man-made artifacts suitable for designation. *Id.* at 18. This discussion, while no doubt of interest to the histori-

■ Even if broad judicial review of the exercise of the President's discretion is not available, plaintiffs still contend that the procedure which led to the designation fell so far afoul of the requirements of the National Environmental Policy Act (NEPA) as to warrant strip-mining the Monument. Plaintiffs contend that defendants conspired to violate the requirements of NEPA by (nefariously) creating a deceptive paper trail suggesting that it was the President, rather than the DOI, who provided the impetus to create the Grand Staircase Monument. In plaintiffs' formulation of the law, the *sine qua non* of

a valid exercise of the President's discretion under the Antiquities Act is that the President proposed the idea to the DOI; the source of the inspiration for the monument determines whether NEPA and the Administrative Procedures Act (APA) are invoked:

> Although Defendant Gale Norton and the Department of the Interior are required to implement NEPA, defendants correctly assert that presidential actions under the Antiquities Act are not subject to the requirements of NEPA. It is for this reason that it was essential to

an, is irrelevant to the legal questions before the Court, since the plain language of the Antiquities Act empowers the President to set aside "objects of historic or scientific interest." 16 U.S.C. § 431. The Act does not require that the objects so designated be made by man, and its strictures concerning the size of the area set aside are satisfied when the President declares that he has designated the smallest area compatible with the designated objects' protection. There is no occasion for this Court to determine whether the plaintiffs' interpretation of the congressional debates they quote is correct, since a court generally has recourse to congressional intent in the interpretation of a statute only when the language of a statute is ambiguous. *See Ardestani v. Immigration and Naturalization Service,* 502 U.S. 129, 135, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) ("The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' when a contrary legislative intent is clearly expressed") (citations omitted).

In addition to the plain language of the statute, there is plain language on which this Court may rely in several United States Supreme Court decisions upholding particular designations of natural objects as national monuments under the Antiquities Act. In *Cameron v. United States* the Court quoted from the proclamation in which President Theodore Roosevelt designated the Grand Canyon: "The Grand Canyon, as stated in the Proclamation, 'is an object of unusual scientific interest.' " 252 U.S. 450, 455, 40 S.Ct. 410, 64 L.Ed. 659 (1920). Far from indicating that only man-made objects are suitable

for designation, *Cameron* notes approvingly that the Canyon "affords an unexampled field for geologic study [and] is regarded as one of the great natural wonders." *Id.* at 456, 40 S.Ct. 410. The Court in *Cappaert v. United States* explicitly rejected the argument offered by the Plaintiffs before this Court: Petitioners . . . argue . . . [that] the President may reserve federal lands only to protect archeologic sites. However, the language of the Act which authorizes the President to [designate] national monuments . . . is not so limited. 426 U.S. 128, 142, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). In *Cappaert* the Court upheld a designation of a pool inhabited by "a peculiar race of desert fish . . . found nowhere else in the world." *Id.* at 133, 96 S.Ct. 2062. The Court has also upheld a designation of islands notable for "fossils . . . and . . . noteworthy examples of ancient volcanism, deposition, and active sea erosion," rather than for human artifacts. *United States v. California* 436 U.S. 32, 34, 98 S.Ct. 1662, 56 L.Ed.2d 94 (1978).

*United States v. California* addresses not only the President's discretion to designate natural objects but the geographic scope of that discretion as well. Determining whether a designation had reserved only protruding rocks and islets or submerged lands and waters adjacent to them as well is "a question only of Presidential intent, not of Presidential power." *Id.* at 36, 98 S.Ct. 1662. In light of this unambiguous United States Supreme Court precedent concerning the Antiquities Act, plaintiffs' reliance on legislative history is clearly misplaced, and their arguments regarding the objects and area of designation untenable.

Defendants to make it appear that the request for consideration of a national monument in Utah came from the President rather than originating, as it did, within the agencies.

(Plaintiffs' Combined Memo ISO Summary Judgment and Opp. Defendants' Motions to Dismiss or for Summary Judgment) (internal citations omitted). If plaintiffs' theory were correct, its evidence that the idea for the Grand Staircase Monument did not originate with the President would be relevant and perhaps sufficient to defeat a motion for summary judgment. Plaintiffs' brief is innocent of any legal authority, however, that would connect the premises that the DOI's final actions are subject to NEPA while the President's actions under the Antiquities Act are not, with the conclusion that it is essential for the idea of a monument to have come from the President. Plaintiffs and defendants are correct that the requirements of NEPA do not apply to the exercise of presidential discretion under the Antiquities Act. To the extent that DOI takes action that could be characterized as final agency action for the purposes of the APA, Plaintiffs are also correct that the requirements of NEPA apply to DOI actions. However, plaintiffs do not cite any legal authority, nor is the Court aware of any, which suggests that these considerations affect the exercise of presidential authority pursuant to the Antiquities Act.[9] Plaintiffs err in importing a requirement of presidential inspiration into the Antiquities Act's grant of authority to the President.

▮▮▮▮ Since the Antiquities Act is silent as to whether there are limitations on the sources from which the President may draw the inspiration to act, if such a limitation exists it must be found in other statutory provisions, the Constitution, or in the common law. Although Plaintiffs have directed the Court to no statutory authority to suggest that NEPA has any application to the President's actions in this case, it is reasonable to look to NEPA for the source of the requirements for which plaintiffs contend. NEPA cannot be the end of the inquiry, however, for NEPA supplies no private right of action. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). If an agency to which NEPA applies has violated its requirements, an aggrieved party must bring its complaint within the mechanism supplied by the APA. The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In order for a violation of NEPA to be redressable at law, therefore, the violation of which a plaintiff complains must form an element of a final agency action subject to judicial review under the APA.

▮▮▮▮ While the United States Supreme Court has not ruled on the precise question whether an agency's recommendation to the President that he designate a particular monument under the Antiquities Act constitutes final agency action subject to judicial review under the APA, there is good law suggesting the contrary. In or-

---

**9.** Plaintiffs' best and only case for the requirement that the idea for a monument originate with the President rather than the DOI is a series of emails and letters generated by personnel within the DOI and the CEQ. (Combined Memo ISO Plaintiffs' Motion for Summary Judgment and Opposition to Defendants' Motions to Dismiss or for Summary Judgment at 37 *et seq.*) At best, Plaintiffs have demonstrated that employees within these agencies believed that the idea for the Monument should appear to originate with the President. The machinations of a few agency employees, and the motivations that animated them, however, cannot take the place of some legal authority supporting the plaintiffs' proposition that the President cannot validly exercise his authority under the Antiquities Act unless the idea for a particular monument originates with him.

der for an agency's action to have that degree of finality that is amenable to judicial review under the APA, it must have some immediate effect beyond that of a recommendation: the action is final agency action only when the agency's action itself "has a direct effect on the day-to-day business" of the persons or entities affected by the action. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

That an agency is incapable of taking "final agency action" in a particular set of circumstances can serve to insulate the agency's preliminary actions (resulting in final *presidential* action) from judicial review under the APA. The United States Supreme Court, in *Franklin v. Massachusetts*, analyzed the President's role in communicating the results of the census to Congress for the purpose of reapportioning seats in the House of Representatives. 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). The statutory scheme at issue required the Secretary of Commerce to communicate the results of the census to the President, who then transmitted those results to Congress. 2 U.S.C. §§ 2a(a); 141(b). The fact that the statute *requires* the President to perform only ministerial functions, such as making apportionment calculations according to set formulae, does not transform the Secretary's action in carrying out the census into final agency action for the purposes of review under the APA. Because the statute did not require the President to use the data from the Secretary's report, and because the President is not precluded from directing the Secretary to amend or correct the report, it is the President's actions, and not those of the Secretary, that effect changes to

apportionment. *Franklin*, 505 U.S. at 797–99, 112 S.Ct. 2767.

Central to the determination whether there exists final agency action subject to review under the APA is the question "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Id.* at 797, 112 S.Ct. 2767. When the statute does not permit the agency to act alone, but rather requires presidential action before there is any direct effect on the parties, "there is no determinate agency action to challenge" until the President acts. *Id.* at 799, 112 S.Ct. 2767. Even when the presidential action authorized by statute permits the exercise of only limited discretion, and the President will almost certainly rely quite heavily on agency recommendations, the fact that presidential action is required before there will be any effect eliminates the prospect of judicial review under the APA.[10]

 Flaws in an agency process leading to a recommendation to the President, that in turn leads to presidential action, do not convert the action of the agency, or that of the President, into action subject to judicial review under the APA. In *Dalton v. Specter* the United States Supreme Court reiterated the rule that a process leading to a recommendation, which the President could then choose to accept or reject, even if flawed, did not permit of judicial review pursuant to the APA, since the recommendation did not constitute final agency action. 511 U.S. 462, 469–70, 114 S.Ct. 1719, 128 L.Ed.2d 497 ("The action that 'will directly affect' the military

---

10. The Supreme Court summarily dismisses the possibility that the President is an agency within the meaning of the APA. Although the definition of agency in the APA does not explicitly exclude the President, "textual silence is not enough to subject the President to the

provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion." *Franklin*, 505 U.S. at 800–801, 112 S.Ct. 2767.

bases is taken by the President ... Accordingly, the Secretary's and Commission's reports serve 'more like a tentative recommendation than a final and binding determination ...' The reports are, 'like the ruling of a subordinate official, not final and therefore not subject to review' ") (citations omitted).

That an agency's process may have been flawed is not only irrelevant for purposes of review under the APA, it is also powerless to transform a presidential action based on a flawed agency recommendation into a violation of a statute conferring presidential discretion. The Court in *Dalton* conceded, *arguendo*, the proposition that judicial review might be available outside the APA for some claims that a President exceeded the authority given by some statutes, but "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President." 511 U.S. 462, 474, 114 S.Ct. 1719, 128 L.Ed.2d 497. While recognizing that some agency processes leading to presidential action are insulated from judicial review by the combination of an absence of final agency action and a grant of discretion to the President, the Court observed that it best fulfils its own constitutional mandate by "withholding judicial relief where Congress has permissibly foreclosed it." *Id.* at 477, 114 S.Ct. 1719. Confronted by a statute expressly conferring discretion on the President to make precisely the sort of decision he made in designating the Grand Staircase Monument, this Court must conclude that "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review." *Id.* at 476, 114 S.Ct. 1719.

Assuming that plaintiffs are correct, that the original idea for the Monument was entirely the creature of the DOI, the actions of the DOI had no direct and immediate impact on the plaintiffs. It was the President's action, and not the action of the DOI, that had the legal effect of creating the Monument, and the DOI's activities therefore do not constitute final agency action reviewable under the APA.

## 2. CONSTITUTIONAL CLAIMS

In contrast to the limited judicial review discussed above, judicial review to determine the constitutionality of a President's acts may be appropriate. See *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1944); *Franklin v. Massachusetts*, 505 U.S. at 801, 112 S.Ct. 2767 ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements. Although the President's actions may still be reviewed for constitutionality"). Plaintiffs raise three constitutional claims in this case. First, they assert that the Antiquities Act itself is unconstitutional in violation of the delegation doctrine. In addition they claim that even if the Antiquities Act is constitutional the manner in which it was utilized in creating the Grand Staircase Monument violated the Property Clause and the Spending Clause.

### A. Delegation Doctrine and Property Clause

Plaintiffs contend that Congress violated both the delegation doctrine (or perhaps more accurately, the non-delegation doctrine) and the Property Clause by giving the President, under the Antiquities Act, virtually unfettered discretion to regulate and make rules concerning federal property. Neither contention has merit. While it is true that Congress has the express authority under the Constitution's Property Clause to "dispose of and make all needful Rules and Regulations respect-

ing the Territory or other Property belonging to the United States," it is equally true that Congress may delegate this authority as it deems appropriate. *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), and any delegation is constitutionally permissible if Congress provides "standards to guide the authorized action such that one reviewing the action could recognize whether the will of Congress has been obeyed." See *Id.* at 425–26, 64 S.Ct. 660.[11]

The Antiquities Act sets forth clear standards and limitations. The Act describes the types of objects that can be included in national monuments and a limitation on the size of monuments. See 16 U.S.C. § 431. Although the standards are general, "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Touby v. United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991). Accordingly, the non-delegation doctrine is not violated, nor is the Property Clause, which has repeatedly been construed as allowing Congress to delegate its authority to the executive and judicial branches, including the power to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. Art. IV, § 3, cl. 2. See also *Tulare County v. Bush,* 306 F.3d 1138 (D.C.Cir.2002); *Mountain States Legal Foundation v. Bush,* 306 F.3d 1132 (D.C.Cir.2002); *U.S. v. Garfield County,* 122 F.Supp.2d 1201 (D.Utah 2000).

## B. Spending Clause

█ Plaintiffs contend that the Grand Staircase Monument included privately owned land, the acquisition of which required the expenditure of federal monies. This claim is without merit. The Antiquities Act requires the President to reserve objects of historic or scientific interest that are situated upon lands owned or controlled by the government of the United States. 16 U.S.C. § 431. The President's Proclamation creating the Grand Staircase Monument clearly distinguishes between land owned or controlled by the Government of the United States and land privately owned or controlled. The Proclamation points out that in creating the Grand Staircase Monument the President solely withdrew lands owned or controlled by the United States Government. (Proclamation, A75) With respect to privately owned or controlled lands the Proclamation provides that "Lands and interests in lands not owned by the United States shall be reserved as a part of the monument upon acquisition of title thereto by the United States." (Proclamation, A75). The Proclamation clearly indicates that land privately owned or controlled does not pertain to the Monument, but also designates that such private land may become part of the Monument if it is acquired by future action. Nothing in the Proclamation or in the record supports plaintiffs' contention that federal monies were expended to acquire private land. Furthermore, plaintiffs have failed to allege any facts supporting their contention. The Court finds no violation of the Spending Clause.

---

11. The Courts have upheld virtually every congressional delegation of authority made by Congress for the last 100 years. In fact, there have only been two occasions in the 20th and 21st centuries where congressional delegations of authority were deemed unconstitutional. See *A.L.A. Schechter Poultry Corporation v. U.S.,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

### 3. STATUTORY CLAIMS:

### A. Wilderness Act

 The land within the Grand Staircase Monument amounts to approximately 1.7 million acres. This land, withdrawn by President Clinton, constitutes what he believed to be the requisite amount of land necessary to preserve the designated scientific and historic objects. The withdrawal, according to plaintiffs, constitutes a violation of the Wilderness Act because the President created *de facto* wilderness, which is a power reserved solely to Congress. Plaintiffs' arguments are without merit, finding no support in the language of either the Wilderness Act or the Antiquities Act, or in the case law. In fact, recent case law is to the contrary; in *MSLF v. Bush*, 306 F.3d 1132 (D.C.Cir. 2002), the D.C. Circuit Court of Appeals rejected this same argument.

It is undisputed that the President's designation of the Grand Staircase Monument was made pursuant to his authority under the Antiquities Act. All of the land found within the boundaries of the Monument is part of the Monument, regardless whether it could also qualify as wilderness. Though the Antiquities Act and the Wilderness Act may provide overlapping sources of protection to land that fits within the parameters of both acts, it is beyond dispute that the land reserved within the Grand Staircase Monument is not wilderness and has never been declared to be wilderness pursuant to the Wilderness Act. The fact that some of the acreage within the boundaries of the Grand Staircase Monument is classified as Wilderness Study Areas does not preclude its inclusion in a national monument.

Statutory overlap is not unusual. Numerous statutes provide environmental protection to public land and it is not surprising that some of them overlap. In *MSLF v. Bush*, the D.C. Circuit Court of Appeals recognized several examples of this, observing that in addition to their other purposes, the Wilderness Act, 16 U.S.C. §§ 1131–36 (2000), the Park Service Organic Act, 16 U.S.C. §§ 1–4 (2000), the National Forest Management Act of 1976, Pub.L. No. 94–588, 90 Stat. 2949 (codified as amended in scattered sections of 16 U.S.C.) (2000), FLPMA, 43 U.S.C. § 1701, and the Multiple Use Sustained Yield Act, 16 U.S.C. §§ 528–29, 531 (2000), all protect scenic values, natural wonders, and wilderness values. See *Bush*, 306 F.3d at 1138. If overlapping sources of protection were not allowed, the Park Service Organic Act would be a repeat offender, as it protects not only wilderness simultaneously with the Wilderness Act, but it also protects endangered species in a manner similar to the Endangered Species Act. As the D.C. Circuit stated, "MSLF misconceives federal laws as not providing overlapping sources of protection." *Id.* at 1138.

Plaintiffs' argument would prevent a President of the United States from including within a national monument not only lands already declared by Congress as "wilderness," a contention which is itself dubious, but also all lands that have previously been classified as Wilderness Study Areas and included in unsuccessful wilderness proposals of some members of the public and some members of Congress. Plaintiffs' contention is contrary to the purpose of the Antiquities Act, which is to identify and protect important scientific and historic objects and to set aside the necessary surrounding land to insure their continued protection. If plaintiffs' position were sound, a President would be prohibited from including within a national monument any land with the possibility of being declared wilderness, even though such land qualifies as 1) an object of historic or scientific value, or 2) land that must be set aside in order to protect designated objects. Such an outcome would effectively repeal the Antiquities Act in these circum-

stances, and no such intent to repeal was expressed implicitly or explicitly by Congress in the Wilderness Act. Furthermore, if the land deemed necessary to be included within a national monument includes wilderness areas or Wilderness Study Areas, it appears likely that such lands would continue in their existing state with the attendant restrictions on use. Any other result would be in violation of the Wilderness Act; but nothing in either the Wilderness Act or the Antiquities Act prevents such lands from being part of a national monument.

An underlying theme of plaintiffs' position is a belief that President Clinton and those of his political persuasion were able to (improperly) accomplish through the Antiquities Act what they had been unsuccessful in accomplishing through the Wilderness Act. The proponents of wilderness designation for approximately 900,000 acres of the federal land that ended up within the Grand Staircase Monument had earlier failed to persuade Congress to designate the land as wilderness. Thereafter, however, according to plaintiffs, they achieved most, if not all, of the protection they were seeking for this land when the President included the acreage within the Grand Staircase Monument. Plaintiffs feel this second, successful, effort at protecting the land was unlawful. But they can point to no law that was broken in creating the Grand Staircase Monument. The President unquestionably had the authority to do what he did under the Antiquities Act.

After briefing was closed in this case, the United States District Court for the District of Wyoming decided *Wyoming v. U.S. Dept. of Agri., et al*, 277 F.Supp.2d 1197 (D.Wyo.2003). Plaintiffs urge this Court to follow the reasoning in that case in which the Department of Agriculture's Roadless Rule was found to be in violation of the Wilderness Act. That case and the instant case, however, have one critical

difference that makes the *Wyoming* case inapplicable here. *Wyoming* concerned a rule promulgated solely within and pursuant to the authority of an executive branch department, whereas this case concerns not the rule-making authority of a lower-level department, but of the President himself as specifically designated by an act of Congress. This distinction is critical.

The *Wyoming* case addressed the actions of the U.S. Forest Service and the Clinton Administration which culminated in the so-called "Roadless Rule" being entered as a Record of Decision by the Secretary of Agriculture on January 5, 2001. The Roadless Rule was put on a very fast track, beginning with a directive from President Clinton to the U.S. Forest Service on October 13, 1999, and ending with a fully completed (and· NEPA mandated) agency review process only 15 months later. The Roadless Rule specifically prohibited road construction and other uses in inventoried roadless areas of the National Forest System, and by so doing created 58.5 million acres of what the district court referred to as *de facto* wilderness because the protection and treatment of the subject acreage was virtually indistinguishable from wilderness. In addition to finding that the hurried-up process violated NEPA, the district court found that the Roadless Rule violated the Wilderness Act. Central to this latter finding were two main points. First, as stated above, the Court recognized that the land in question was *de facto* wilderness because a) the land was the same as wilderness in its definition (i.e. "roadless area" is virtually synonymous with "wilderness area"); b) the land had the same use restrictions as wilderness; and c) the land was virtually identical to the land recommended (unsuccessfully) as wilderness by the 1977 RARE II inventory. Second, the district court recognized that one of the primary objectives of the 1964 Wilderness Act was to end the then-existing practice of executive

branch agencies, including notably the Forest Service, designating wilderness areas in their sole discretion and as they saw fit, with no direct authority from Congress. As the district court stated:

> To this end, the Wilderness Act removed the Secretary of Agriculture's and the Forest Service's discretion to establish de facto administrative wilderness areas, a practice the executive branch had engaged in for over forty years. Instead, the Wilderness Act places the ultimate responsibility for wilderness designation on Congress. In this regard, the Wilderness Act functions as a "proceed slowly order" until Congress—through the democratic process rather than by administrative fiat—can strike the proper balance between multiple uses and preservation. (citations omitted). *Id* at 1233.

The *Wyoming* court concluded its review of the Wilderness Act by stating "[t]his statutory framework necessarily acts as a limitation on *agency* action." *Id.* at 1233. Notably, the district court did not say "a limitation on *Presidential* action," and certainly nothing in the *Wyoming* opinion suggests the court would have employed the same reasoning to the creation by the President of a national monument under the Antiquities Act.

If the instant case involved actions by the Secretary of the Interior, or the BLM, to use departmental or agency rule-making authority to protect federal lands that had previously failed to achieve wilderness status after having been identified as candidates for such status, and if the protection was virtually identical to the protection afforded wilderness, the outcome here might be the same as in *Wyoming*. But those are not the facts of this case and that is not the issue before this Court. Here the Court is faced with an entirely different question involving presidential action performed precisely as granted and directed by Congress.

## B. NEPA, FLPMA, FACA and the Anti–Deficiency Act

When bringing a lawsuit for violation of statutory law parties must either find language in the statute itself which allows a private right of action, or demonstrate the occurrence of final agency action, which invokes the Court's authority to review the claim under the Administrative Procedure Act. If parties fail to meet these requirements they are precluded from challenging the alleged statutory violation. Plaintiffs allege that in his designation of the Grand Staircase Monument the President and the other defendants violated NEPA, FLPMA, FACA and the Anti–Deficiency Act. These statutes, however, provide no private right of action to an aggrieved party. See *Lujan*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (no private right of action available under NEPA and FLPMA); *Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F.Supp.2d 20 (D.D.C. 2002); (Federal Advisory Committee Act creates no private right of action); *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442 (Fed. Cir.1997) (no private right of action available under the Anti–Deficiency Act).

Because none of these statutes provide private rights of action the plaintiffs are left with the insurmountable task in this case of demonstrating final agency action to invoke review under the APA. As stated previously in this Opinion the Supreme Court of the United States has declared that the President is not an agency and cannot be defined as such under the APA. See *Franklin v. Massachusetts*, 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992); *Dalton v. Specter*, 511 U.S. 462, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994); *Armstrong v. Bush*, 924 F.2d 282, 288 (D.C.Cir.1991). It follows that actions taken by the President pursuant to congres-

sionally delegated authority cannot be considered final agency action.

Also as discussed previously in this Opinion, (see pp. 23–28), plaintiffs' contention that the defendant lower-level executive branch officials' recommendations to the President constituted final agency action is also without merit. Recommendations and actions taken by the lower-level executive branch officials encouraging designation of the Grand Staircase Monument constituted nothing more than recommendations and assistance to the President and failed to meet the legal requirements for final agency action. See generally *Franklin,* 505 U.S. at 800, 112 S.Ct. 2767. All decisions and actions constituting final action were made by the President in his official capacity. The ultimate decision to create the Grand Staircase Monument rested with, belonged to, and was made by, President Clinton.

## C. Executive Order 10355

 UAC next argues that the President's designation of the Grand Staircase Monument was invalid because it violated Executive Order 10355 (E.O.10355). E.O. 10355 was issued by President Harry S. Truman in 1952. It delegated to the Secretary of the Interior "the authority vested in the President by section 1 of the act of June 25, 1910 [the Pickett Act], and the authority otherwise vested in him to withdraw or reserve lands of the public domain and other lands owned or controlled by the United States … for public purposes." 17 Fed.Reg. 4831 (May 26, 1952). The Secretary of the Interior was also authorized to "modify or revoke withdrawals and reservations of such lands heretofore or hereafter made." *Id.* The Order further

directed that "[a]ll orders issued by the Secretary of the Interior under the authority of this order shall be designated as public land orders and shall be submitted to the Division of the Federal Register. … for filing and for publication in the FEDERAL REGISTER." *Id.*

President Truman issued E.O. 10355 by virtue of section 301 of title 3 of the United States Code,[12] which states that the President may delegate "any function which is vested in the President by law" to an agency or department head. It also states "that nothing contained herein shall relieve the President of his responsibility in office for the acts of any such head or other official designated by him to perform such functions." 3 U.S.C. § 301. The President must publish such authorization in the Federal Register, but he may place terms, conditions, and limitations on the use of the delegated authority, and he may revoke the delegation "in whole or in part" at any time. *Id.*

Plaintiffs contend that the phrase "authority otherwise vested in him" in E.O. 10355 include the authority to withdraw lands under the Antiquities Act and transfers the President's authority under that Act exclusively to the Secretary of the Interior. For this argument to prevail, several prerequisites must have been fulfilled: 1) E.O. 10355 must have contemplated the transfer of the President's authority under the Antiquities Act, 2) the transfer must have been valid, that is, the underlying statute must allow such a transfer, 3) the transfer must have been complete, meaning that the President retained no authority under the Antiquities Act, and 4) E.O. 10355 must still be in

---

**12.** 3 U.S.C. § 301 is a general authorization to delegate presidential functions. Both parties in this case seem to mistakenly believe that E.O. 10355 was issued pursuant to "statutory authority under the Pickett Act" and implied authority under the *Midwest Oil* doctrine. Although it delegated the withdrawal authority under the Pickett Act and the *Midwest Oil* doctrine, the authority to delegate those withdrawal powers came from 3 U.S.C. § 301, not from the withdrawal authority itself.

force; i.e. it has not since been repealed or revoked. If any of these conditions has not been met, E.O. 10355 poses no restraint on the President's authority to designate a national monument under the Antiquities Act.

### 1. Delegation of Authority under the Antiquities Act

It is questionable whether E.O. 10355 ever delegated the authority granted to the President under the Antiquities Act. Although the language of the Order is general, to construe the Order as granting every withdrawal authority possessed by the President would, in the Court's view, be an overly broad interpretation. E.O. 10355 specifically delegates to the Secretary of the Interior the President's authority under the Pickett Act as well as "the authority otherwise vested in [the President] to withdraw and reserve lands..." The broad, almost all-encompassing language of the Order presents an ambiguity and should be interpreted with reference to the entire Order. *See, In re Crowell,* 305 F.3d 474, 478 (6th Cir.2002) (administrative orders delegating authority to agency officials warrant the use of rules of construction similar to those used in statutory interpretation); *U.S. v. Brown,* 348 F.3d 1200, 1209 (10th Cir.2003) (to determine the meaning of ambiguous language in regulations, a court should look for clues elsewhere in those regulations); *citing,*

*Oxy USA, Inc. v. Babbitt,* 268 F.3d 1001, 1005 (10th Cir.2001) (similar rule for statutory construction).

The defendants argue that "the authority otherwise vested in him" refers to the authority granted to the President under the *Midwest Oil* doctrine,[13] which seems reasonable given that the authority under both the Pickett Act and the *Midwest Oil* doctrine are similar and related. This interpretation would also help explain why President Truman did not refer specifically to the Antiquities Act in delegating the President's withdraw authority, a practice to which he seemed accustomed. *See, e.g.,* Exec. Order No. 10250, 16 Fed.Reg. 5385 (June 5 1951), *reprinted as amended in* 3. U.S.C.A. § 301 at 849–51 (1997) (delegating functions to the Secretary of the Interior and specifying more than 15 statutes from which those functions were derived).

Moreover, courts will generally give substantial deference to the President's or the applicable department's interpretation and use of an executive order. *See e.g., Alaniz v. Office of Pers. Mgmt.,* 728 F.2d 1460, 1465 (Fed.Cir.1984) ("it is recognized that an agency has presumed expertise in interpreting executive orders charged to its administration, and judicial review must accord great deference to the agency's interpretation"), *citing Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–2, 13 L.Ed.2d 616 (1965).[14] Since E.O. 10355

---

**13.** The *Midwest Oil* doctrine stems from the Supreme Court case *United States v. Midwest Oil Co.,* 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915). In *Midwest Oil,* President Theodore Roosevelt issued a special Order in anticipation of the Pickett Act withdrawing all public lands which were being used for petroleum exploration. The Order was challenged, but was upheld by the Court. The Court recognized that the President was not acting in a novel manner, but rather was following a precedent that had been set many years before by his predecessors.

**14.** *Udall* is particularly relevant to the present dispute. In *Udall,* the Supreme Court upheld the actions of the Secretary of Interior and deferred to the Secretary's interpretation of an executive order granting him authority to act. The Court's language is particularly helpful:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.... When the construction of an administrative regulation rather than

was issued, land has been withdrawn on 20 different occasions to create national monuments.[15] Each of these monuments was designated by the President. No national monument has been designated by the Secretary of the Interior pursuant to E.O. 10355 since its enactment in 1952. Such action on the part of both the President and the Secretary of the Interior strongly indicates that neither interpreted E.O. 10355 to include the authority granted under the Antiquities Act. As a result, this Court will not imply such an interpretation.

## 2. Validity of a delegation of Antiquities Act Authority

Even assuming that E.O. 10355 originally contemplated within its language delegating the authority to withdraw land for designating national monuments, "a President may only confer by Executive Order rights that Congress has authorized the President to confer." *Karuk Tribe of California v. Ammon*, 209 F.3d 1366, 1375

(Fed.Cir.2000). As the regulations implementing section 204 of FLPMA recognized, E.O. 10355 "conferr[ed] on the Secretary of the Interior all of the *delegable* authority of the President..." 43 C.F.R. § 2300.0–3(a)(2) (2004) (emphasis added).

Although 3 U.S.C. § 301 authorizes the President to delegate "any function which is vested in [him] by law" to a department or agency head in the executive branch, delegation of the authority to designate national monuments seems inconsistent with the Antiquities Act itself. The Antiquities Act provides that "[t]he President ... is authorized, *in his discretion*, to [designate national monuments]." 16 U.S.C. § 431 (2000) (emphasis added). Because Congress only authorized the withdrawal of land for national monuments to be done in the President's discretion, it follows that the President is the only individual who can exercise this authority because only the President can exercise his own discretion. Discretion is defined as "[a] public official's power or right to act in

---

a statute is in issue, deference is even more clearly in order... "It may be argued that while these facts and rulings prove a usage, they do not establish its validity. But government is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any long continued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself,—even when the validity of the practice is the subject of investigation."
*Udall*, 380 U.S. at 16–17, 85 S.Ct. at 801–2, 13 L.Ed.2d 616, quoting *Midwest Oil*, 236 U.S. at 472–3, 35 S.Ct. at 319, 59 L.Ed. 673.

**15.** Below is a list of national monuments designated pursuant to the Antiquities Act since E.O. 10355 was issued, along with the respec-

tive President who exercised the withdrawal authority.

Dwight D. Eisenhower
7/14/56 Edison Laboratory, NJ
1/18/61 Chesapeake and Ohio Canal, MD–WV

John F. Kennedy
5/11/61 Russell Cave, AL
12/28/61 Buck Island Reef, VI

Lyndon B. Johnson
1/20/69 Marble Canyon, AZ

Jimmy Carter
12/1/78 Admiralty Island, AK (Forest Service)
12/1/78 Aniakchak, AK
12/1/78 Becharof, AK
12/1/78 Bering Land Bridge, AK
12/1/78 Cape Krusenstern, AK
12/1/78 Denali, AK
12/1/78 Gates of the Arctic, AK
12/1/78 Kenai Fjords, AK
12/1/78 Kobuk Valley, AK
12/1/78 Lake Clark, AK
12/1/78 Misty Fjords, AK (Forest Service)
12/1/78 Noatak, AK
12/1/78 Wrangell–St. Elias, AK
12/1/78 Yukon–Charley, AK

certain circumstances according to personal judgment and conscience." BLACK'S LAW DICTIONARY 479 (7th ed.1999). It is illogical to believe that the President can delegate his personal judgment and conscience to another.

Moreover, E.O. 10355 authorizes the Secretary of the Interior to "redelegate the authority delegated to him by this order to ... the Under Secretary of the Interior and [to] the Assistant Secretaries of the Interior." If the Court were to accept UAC's argument, the unfettered discretion [16] of the President to withdraw public lands for national monuments could potentially be vested in several individuals. Such a result is untenable and clearly beyond what Congress intended when passing the Antiquities Act.

This Court is persuaded that the President, and only the President, may designate National monuments under the Antiquities Act regardless whether President Truman intended to delegate this authority by means of E.O. 10355. The Court finds support for its interpretation in *State of Alaska v. Carter*, 462 F.Supp. 1155, 1159 (D.Alaska 1978) ("The Antiquities Act authorizes the President 'in his discretion' to declare objects that have scientific interest, and are situated upon the public lands, to be national monuments. The Act au-

thorizes only the President to declare these reservations and apparently this authority cannot be delegated." (citations omitted)).

### 3. Complete delegation of authority

UAC's reliance on E.O. 10355 also assumes that the delegation of authority was complete; that is, that the President relinquished all of his authority under the Antiquities Act to the Secretary of the Interior, forbidding any future action by the President himself pursuant to the Act. This interpretation is suspect where the language of E.O. 10355 does not specifically limit the President nor empower the Secretary of the Interior in such a manner. Additionally, history has shown that presidents after Harry S. Truman continued to designate national monuments using the authority granted by the Antiquities Act.

The Second Circuit faced a similar question in *Clarry v. United States*, 85 F.3d 1041 (2d Cir.1996). In *Clarry*, former air traffic controllers had been indefinitely barred by President Reagan from employment with the Federal Aviation Administration (FAA) and private entities that contracted with the FAA because of their participation in a strike against the United States. The President ordered the indefinite bar notwithstanding the regulations

---

12/1/78 Yukon Flats, AK

**16.** Although FLPMA imposes numerous requirements on the Secretary of the Interior when withdrawing land, the Antiquities Act was specifically exempted from the reach of FLPMA. In passing FLPMA, the House stated:

> The main authority used by the Executive to make withdrawals is the 'implied' authority of the President recognized by the Supreme Court in *U.S. v. Midwest Oil Co.* (236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673). The bill would repeal this authority and, with certain exceptions, all identified withdrawal authority granted to the President or the Secretary of the Interior. The exceptions, which are not repealed, are contained in

the Antiquities Act (national monuments), Alaska Native Claims Settlement Act (native and public-interest withdrawals), the Defense Withdrawal Act of 1958, and Taylor Grazing Act (grazing districts).

H.R.Rep. No. 94–1163, 94th Cong., 2d Sess. 5 (1976), reprinted in 1976 U.S.C.C.A.N. 6175, 6203.

Therefore, when the President is creating national monuments pursuant to the Antiquities Act, his discretion would be unquestioned by Congress. If E.O. 10355 did indeed delegate to the Secretary of the Interior the President's Antiquities Act authority, it stands to reason that FLPMA would remain inapplicable to the actions of the Secretary if the Secretary designated a national monument.

promulgated by the Office of Personnel Management (OPM), which provided for only a three year ban. The regulations had been issued pursuant to authority delegated to the OPM by the President in two prior executive orders. The Second Circuit found that the President had not specifically delegated to the OPM his statutory authority "to prohibit the employment of individuals who have participated in a strike against the United States." *Id.* at 1048. Because there was no specific delegation, the executive orders did not constitute a complete delegation of the President's authority. Therefore, nothing prevented the President from implementing an indefinite employment bar pursuant to his statutory authority and notwithstanding regulations to the contrary. *Id.*

We are faced with a similar situation. UAC argues that the President may no longer use the authority granted to him under the Antiquities Act because of E.O. 10355. However, there is nothing in the language of the Order to indicate that, even if the authority to designate national monuments was delegated to the Secretary of the Interior—which the Court does not find—there was a complete delegation of authority. Without a specific reference to the Antiquities Act, and some indication that the President no longer intended to designate national monuments, this Court cannot conclude that E.O. 10355 constituted a complete delegation of the President's authority. On the contrary, the fact that Presidents continued to exercise Antiquities Act authority indicates that, even if E.O. 10355 was a valid delegation of authority, the authority to withdraw national monuments remained concurrently with the President and did not solely reside with the Secretary of the Interior.

### 4. Revocation of E.O. 10355

In addition to the previous arguments, defendants contend that FLPMA implicitly repealed E.O. 10355, transfer-

ring all authority under the Antiquities Act, if it ever was delegated, back to the President. "The test used to determine whether a statute has been repealed is also used for an executive order. A repeal may be explicit or implicit, [and][t]he ultimate question is whether repeal of the prior statute [or order] was intended." *Mille Lacs Band of Chippewa Indians v. Minn.*, 861 F.Supp. 784, 829 (D.Minn.1994) *citing Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153–54, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976).

Any delegation of authority pursuant to 3 U.S.C. § 301 is "revocable at any time by the President in whole or in part." Because Presidents continued to withdraw public land for national monuments after E.O. 10355 was issued, the logical conclusion is that any delegation of authority under the Antiquities Act that E.O. 10355 may have made was implicitly revoked. Such a revocation is well within the President's authority to partially revoke his own executive order.

Additionally, FLPMA and its attendant regulations also indicate that Congress intended to repeal any delegation authority to designate national monuments to the Secretary of the Interior. Through FLPMA, Congress specifically repealed the Pickett Act, the *Midwest Oil* doctrine and other Acts granting withdrawal authority to the President, thereby extinguishing Presidential authority to withdraw public lands in many circumstances. As a result, Congress also revoked any delegations of authority to other members of the Executive Branch related to the repeal of that authority. Notably, FLPMA specifically excludes the Antiquities Act from its reach and reaffirms the President's authority to designate national monuments. Even more, the regulations seem to indicate that, even if the Secretary of the Interior previously enjoyed authori-

ty to designate national monuments, that was no longer the case: "the Secretary of the Interior does not have authority to ... [m]odify or revoke any withdrawal creating national monuments under the Act of June 8, 1906 (16 U.S.C. 431–433), sometimes referred to as the Antiquities Act." 43 C.F.R. § 2300.0–3(a)(1)(iii). Although the regulations go on to state that, by virtue of E.O. 10355, the Secretary still possesses all the delegable Presidential authority to "make, modify and revoke withdrawals and reservations with respect to lands of the public domain ...," 43 C.F.R. § 2300.0–3(a)(2), it appears evident that Congress never considered authority under the Antiquities Act as "delegable" in the first place.

Therefore, any effect E.O. 10355 may have had on the President's authority to withdraw land for national monuments under the Antiquities Act has been repealed, both by Presidential action and Congressional legislation.

### 5. Private Right of Action to Enforce Executive Orders

 Finally, even if this Court were to accept UAC's argument that because of E.O. 10355 the Secretary of the Interior is currently the only individual invested with authority to withdraw public land to create national monuments pursuant to the Antiquities Act, the Court questions whether UAC or a court can enforce E.O. 10355. It is well settled that "[g]enerally, there is no private right of action to enforce obligations imposed on executive branch officials by executive orders." *Zhang v. Slattery*, 55 F.3d 732, 747 (2nd Cir.1995) (quotations and citations omitted). Furthermore, "to assert a judicially enforceable private cause of action under an executive order, a plaintiff must show (1) that the President issued the order pursuant to a statutory mandate or delegation of authority from Congress, and (2) that the Order's terms and purpose evi-

denced an intent [on the part of the President] to create a private right of action." *Centola v. Potter*, 183 F.Supp.2d 403, 413 (D.Mass.2002), citing *Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 234–35 (8th Cir.1975). E.O. 10355 fails on both counts to create a private right of action.

First, E.O. 10355 was not issued pursuant to a "statutory mandate" from Congress and therefore does not have the effect of law. Were this so, there would be some language in the Antiquities Act itself directing the President to delegate or otherwise employ the authority granted to him. There is no such mandate from Congress. Rather, President Truman resorted to 3 U.S.C. § 301 as authority for E.O. 10355, which grants broad delegation authority to the President. This authority seems managerial in nature, giving the President the ability to direct and delegate the affairs of the executive branch in a manner he deems best. Because this was an internal delegation in the executive branch, revocable at any time by the President, E.O. 10355 does not have the force or effect of law.

Second, there is nothing in E.O. 10355 itself indicating that President Truman intended to create a private right of action to enforce compliance with the order. In the absence of such an intent on the face of the order, this Court will not imply one.

UAC's argument that E.O. 10355 forbids the President from withdrawing public lands for national monuments fails on many levels, any one of which is sufficient for this Court to hold that E.O. 10355 did not prohibit the President from designating the Grand Staircase Monument under the Antiquities Act.

### CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss and in the alternative for Summary Judgment is *GRANTED;*

plaintiffs' Motions for Summary Judgment are *DENIED* in their entirety. IT IS SO ORDERED.