WESTERN WATERSHEDS
PROJECT, Plaintiff,

v.

BUREAU OF LAND MANAGEMENT,
Defendant.

No. CV 08–1472–PHX–MHM.

United States District Court,
D. Arizona.

June 12, 2009.

Erik Bowers Ryberg, Attorney at Law, Tucson, AZ, Lauren M. Rule, Advocates for the West, Boise, ID, for Plaintiff.

Donna S. Fitzgerald, Tyler Guy Welti, US Department of Justice, Washington, DC, Richard Glenn Patrick, US Attorney's Office, Phoenix, AZ, for Defendant.

## ORDER

MARY H. MURGUIA, District Judge.

Currently before the Court is the Bureau of Land Management's Motion to Dismiss Western Watersheds Project's Amended Complaint for lack of subject matter jurisdiction and failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. # 25). After reviewing the pleadings and holding oral argument on January 13, 2009, and May 13, 2009, the Court issues the following order.

## I. PROCEDURAL HISTORY

On August 11, 2008, Plaintiff Western Watersheds Project ("WWP") filed a Complaint against Defendant Bureau of Land Management ("BLM"), challenging the BLM's renewal of grazing permits and subsequent annual grazing authorizations under the Sonoran Desert National Monument Proclamation ("Proclamation"), Proclamation No. 7397, 66 Fed.Reg. 7354 (Jan. 22, 2001). (Compl., Dkt. # 1, ¶¶ 75–78). WWP also alleges that the BLM has violated the Proclamation by failing to issue (1) a determination as to whether livestock grazing is compatible with the purpose of protecting the natural and historic resources on the Sonoran Desert National Monument ("SDNM" or "Monument"), and (2) a management plan addressing the necessary actions to protect the natural and historic resources on the Monument. (Amend. Compl., Dkt. # 9, ¶¶ 71–75).

Six days after filing its Amended Complaint on October 21, 2008, and prior to any responsive pleading by the BLM, WWP filed a Motion for Summary Judgment and Injunction. (Dkt. # s 10–19). WWP also filed a separate Motion for Permanent Injunction on October 31, 2008. (Dkt. # s 22–23).

On November 4, 2008, the BLM filed a Motion to Dismiss for lack of subject matter jurisdiction and failure to state a claim under FRCP 12(b)(1) and 12(b)(6), and a Motion to Stay briefing on WWP's Motions for Summary Judgment and Permanent Injunction. (Dkt. # s 24–26). The Court held a hearing on November 18, 2008, and granted the Motion to Stay. (Dkt. # 30). The Court also directed expedited briefing on the Motion to Dismiss and directed the BLM to compile the Administrative Record. (Id.). In addition, WWP withdrew its Motions for Summary Judgment and Permanent Injunction. (Id.).

On February 2, 2009, after holding oral argument, the Court issued an Order granting the BLM's motion to dismiss, holding that WWP's claims for relief were not subject to judicial review under the Administrative Procedures Act ("APA"), and in the alternative, that Section 325 of the Department of the Interior and Related Agencies Appropriation Act of 2004 barred WWP's claims relating to the BLM's renewal of grazing permits. (Dkt. # 38). Then, on February 16, 2009, WWP filed a motion to alter or amend judgment pursuant to Fed.R.Civ.P. 59(e), asking the Court to reconsider its holding that WWP's claims for relief are not subject to judicial review under the APA; reconsideration was not sought on the Court's alternative holding. (Dkt. # 40). After reviewing WWP's motion, the Court ordered the BLM to respond pursuant to L.R.Civ. 7.2(g)(2), which it did, asking the Court to deny WWP's motion. (Dkt. # 49). In addition, two amicus curiae parties filed briefs in support of WWP's motion. (Dkt. # s 47, 51, 61).[1]

On May 13, 2009, the Court held oral argument on WWP's motion to alter or amend the Court's February 2, 2009 order. (Dkt.# 63). After the parties and amici presented their arguments, the Court granted in part WWP's motion, reopening the case, vacating its February 2, 2009 order, and reinstating the BLM's amended motion to dismiss and related pleadings. (Id.). The Court now issues a new order in light of the parties' and amici's further briefing on the issue of whether agency action or inaction taken pursuant to presidential proclamations issued under the Antiquities Act are subject to judicial review under the APA.

## II. BACKGROUND

### A. Sonoran Desert National Monument

On January 17, 2001, President William Jefferson Clinton established the Sonoran Desert National Monument by signing Proclamation No. 7397, 66 Fed.Reg. 7354 (Jan. 22, 2001), under the authority of Section 2 of the Antiquities Act of 1906, 16 U.S.C. § 431. (Amend. Compl., Ex. 1 to Rule Decl.). The Monument is located approximately 60 miles southwest of Phoenix, Arizona and encompasses 496,377 acres of "untrammeled Sonoran desert landscape." (Id., ¶¶ 15–16, 20). The Monument was created to preserve and protect the functioning Sonoran desert ecosystem and diverse array of biological, scientific, and historic resources located within the Monument. (Id., Ex. 1 to Rule Decl.).

Proclamation No. 7397 states that the Secretary of the Interior must manage the Monument through the BLM to implement the purposes of the Proclamation and pre-

---

1. The instant order does not specifically cite to the pleadings filed in connection with WWP's motion to alter or amend judgment, nor does it distinguish between the arguments presented by WWP and the amici. Regardless, the instant order considers and attempts to address the relevant arguments presented by the parties and amici in their respective pleadings.

pare a management plan that addresses the actions necessary to protect the objects identified in the Proclamation. 66 Fed.Reg. at 7356. The Proclamation also prohibits the BLM from renewing grazing permits on Federal lands within the Monument south of Interstate Highway 8, and provides that grazing north of Interstate 8 may be continued only to the extent that the BLM determines it is compatible with the purpose of protecting the objects identified in the Proclamation. *Id.*

Pursuant to the Proclamation, the BLM has closed most of the grazing allotments within the Monument south of Interstate 8; the remaining allotment was set to close on February 29, 2009. (Amend. Compl., ¶ 34). However, to date, the BLM has not completed a management plan for the Monument or made a determination as to whether grazing within the Monument north of Interstate 8 is compatible with protecting the Monument's natural and historic resources. (*Id.*, ¶¶ 65, 69). In addition to failing to prepare a management plan or issue a grazing compatibility determination, the BLM has renewed grazing permits for five allotments in the northern portion of the Monument and continues to annually authorize grazing on these allotments, as well as on a sixth allotment whose permit was set to expire on February 28, 2009. (Dkt. # 25, p. 5, Exhs. 1A–E).

## B. 1998–2004 Congressional Appropriations Riders

In 1997, the Interior Board of Land Appeals decided that the BLM must prepare site-specific environmental analyses prior to authorizing grazing on allotments within Federal lands. *National Wildlife Federation v. BLM*, 140 IBLA 85 (1997). That ruling, along with a spike in grazing permit expirations (and subsequent changes to the BLM's policies for the renewal of such permits), resulted in a backlog of permit renewals. (Dkt. # 25–2, p.

3). As a result, starting in 1998, Congress began passing legislation in the form of yearly appropriations riders, which directed the BLM to renew, with the same terms and conditions, all grazing permits set to expire during the following fiscal year until the BLM completed processing of the permits in compliance with all applicable laws and regulations. *Omnibus Consol. & Emergency Supplemental Appropriations Act, 1999*, Pub.L. No. 105–277, § 124, 112 Stat. 2681, 2681–261 (1998); *Consol. Appropriations Act, 2000*, Pub.L. No. 106–112, § 123, 113 Stat. 1501, 1501A–159–60 (1999); *Dep't of the Interior & Related Agencies Appropriations Act, 2001*, Pub.L. No. 106–291, § 116, 114 Stat. 922, 943 (2000); *Dep't of the Interior & Related Agencies Appropriations Act, 2002*, Pub.L. No. 107–63, § 114, 115 Stat. 414, 438–39 (2001); *Consol. Appropriations Resol., 2003*, Pub.L. No. 108–7, § 328, 117 Stat. 11, 276–77 (2003).

Most recently, on November 10, 2003, Congress passed the *Department of the Interior and Related Agencies Appropriations Act, 2004*, which likewise directs the BLM to renew all grazing permits set to expire during fiscal years 2004–2008, with the same terms and conditions, until the BLM completes processing of the permits in compliance with all applicable laws and regulations. *See* Pub.L. No. 108–108, § 325, 117 Stat. 1241, 1308 (2004).

## III. LEGAL STANDARD

The BLM moves to dismiss WWP's Amended Complaint for lack of subject matter jurisdiction pursuant to Fed. R.Civ.P. 12(b)(1), or in the alternative, for failure to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt.# 25–2, p. 5).

■ When a party moves to dismiss a complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1),

that party bears the burden of proof that the court has jurisdiction to decide the claim(s). *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) ("It is to be presumed that a cause lies outside [the court's] limited jurisdiction, [ ] and the burden of establishing the contrary rests upon the party asserting jurisdiction."); *see also Thornhill Publ'n v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

On the other hand, "[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir.1997). To survive a motion to dismiss for failure to state a claim, the plaintiff must simply allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007); *see also Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999) ("A dismissal for failure to state a claim is appropriate only where it appears, beyond doubt, that the plaintiff can prove no set of facts that would entitle it to relief.").

In evaluating a motion to dismiss, "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the nonmoving party." *Wyler Summit Partnership v. Turner Broad. Sys. Inc.*, 135 F.3d 658, 661 (9th Cir.1998). However, "the court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001). Likewise, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1965.

■ A district court need not limit itself to the allegations in the complaint, and may take into account "facts that are [ ]

alleged on the face of the complaint [and] contained in documents attached to the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.2005). In addition, "a district court [may] consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994)). Moreover, "[f]or motions to dismiss under Rule 12(b)(1), unlike a motion under Rule 12(b)(6), the moving party may submit affidavits or any other evidence properly before the court . . . . It then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 778–79 (9th Cir.2000); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.2000) ("With a factual Rule 12(b)(1) attack, [ ] a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment.").

## IV. DISCUSSION

### A. The Antiquities Act

The Antiquities Act authorizes the President of the United States, in his discretion, to declare by public proclamation historic landmarks . . . and other objects of historic and scientific interest that are situated upon lands owned or controlled by the Government of the United States to be national monuments, and may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

16 U.S.C. § 431. "Since its enactment, presidents have used the Antiquities Act more than 100 times to withdraw lands from the public domain as national monuments." *Utah Ass'n of Counties v. Bush*, 316 F.Supp.2d 1172, 1177–78 (D.Utah 2004).

■ Courts are severely limited in their review of such congressionally authorized presidential actions:

> It has long been held that where Congress has authorized a public officer to take some specified legislative action[,] when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review.

*United States v. George S. Bush & Co.*, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940) (internal citations omitted). Thus, while courts can evaluate whether the President exercises his discretion in accordance with the standards set forth in the Antiquities Act, courts cannot review the President's determinations and factual findings. *See Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C.Cir.2002) ("Although the Supreme Court has never expressly discussed the scope of judicial review under the Antiquities Act, .... [t]he Court has highlighted the separation of powers concerns that inhere in such circumstances and has cautioned that these concerns bar review for abuse of discretion altogether."); *see also Alaska v. Carter*, 462 F.Supp. 1155, 1160 (D.Alaska 1978) ("[T]he President is not subject to the impact statement requirement of [the National Environmental Policy Act] when exercising his power to proclaim national monuments under the Antiquities Act.").

## B. Judicial Review of Agency Action Taken Pursuant to Presidential Proclamations

WWP asserts two claims for relief in its complaint: (1) violation of the Sonoran Desert National Monument Proclamation for failure to complete a compatibility determination and management plan, and (2) violation of the Sonoran Desert National Monument Proclamation for reauthorizing grazing prior to conducting a compatibility determination. (Amend. Compl., ¶¶ 71–79). Both claims are brought under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The BLM moves to dismiss WWP's Amended Complaint under Fed. R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, asserting that "the APA does not allow for judicial review of Presidential actions." (Dkt. # 34, p. 7). WP, however, contends that it is not challenging "action by the President, such as the monument proclamation itself," but "BLM's failure to complete the mandatory compatibility determination and management plan" as directed in Proclamation No. 7397. (Dkt. # 32, pp. 12–13). In other words, WWP seeks APA review of the BLM's failure to act in accordance with the management directives contained in Proclamation No. 7397, i.e., make a compatibility determination and prepare a management plan.

### i. The APA

■ The Administrative Procedures Act ("APA") provides for judicial review of agency action. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review."). Indeed, "the APA establishes a *strong presumption in favor of reviewability* of agency action." *McAlpine v. United States*, 112 F.3d 1429, 1432 (10th Cir.1997) (emphasis in original); *see*

*Heckler v. Chaney,* 470 U.S. 821, 843, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (Marshall, J., concurring).

■ A court has subject matter jurisdiction to review agency action under the APA where the claims for relief "identify some [particular] agency action" and "the agency action in question [is a] final agency action." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (internal quotation marks omitted); 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").

■■ "[A]n agency's action is not necessarily final merely because it is binding." *Appalachian Power Co. v. E.P.A.,* 208 F.3d 1015, 1022 (D.C.Cir.2000). "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process, ... it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal citations omitted).

■ An agency action, of course, "includes the whole or a part of any agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see Norton v. Southern Utah Wilderness Alliance* ("SUWA"), 542 U.S. 55, 63, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) ("Sections 702, 704, and 706(1) all insist upon an 'agency action,' either as the action complained of (in §§ 702 and 704) or as the action to be compelled (in § 706(1))."). Therefore, "a claim [for failure to act] under § 706(1) can proceed [ ] where a plaintiff asserts that an agency failed to take a discrete agency

action that it is required to take." *Id.* at 64, 124 S.Ct. 2373.

### ii. The APA & Presidential Proclamations

■ It is well settled that the Administrative Procedures Act does not apply to presidential action. *Dalton v. Specter,* 511 U.S. 462, 469, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994) ("[T]he President's actions [are] not reviewable under the APA, because the President is not an 'agency' within the meaning of the APA."); *Franklin v. Massachusetts,* 505 U.S. 788, 800–01, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (President is not an "agency" within the meaning of the APA). *But see Public Citizen v. U.S. Trade Representative,* 5 F.3d 549, 552 (D.C.Cir.1993) ("*Franklin* is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties."). It is also well settled that courts may engage in ultra vires review of presidential proclamations that designate federal lands as national monuments to ensure that the President properly exercised his or her delegated authority under the Antiquities Act. *See, e.g., Mountain States Legal Found.,* 306 F.3d at 1136 ("In reviewing challenges under the Antiquities Act, the Supreme Court has indicated generally that review is available to ensure that the Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority.") (citations omitted). In addition, the Court notes that the parties do not dispute that the President may impose restrictions or directives on the management of federal land in monument proclamations (just as the President may impose directives on agencies through executive orders). (Dkt. # 49, p. 7).

In *Tulare County v. Bush,* 185 F.Supp.2d 18, 28 (D.D.C.2001), the plaintiff sought relief under the APA, alleging that the Forest Service's management of the Giant Sequoia National Monument violated both the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.,* and the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600–14. The district court held that judicial review was unavailable under the APA "because the [agency] is merely carrying out directives of the President, and the APA does not apply to presidential action." *Id.* The court reasoned that:

> Any argument suggesting that this action is agency action would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give presidential action. The court refuses to give the term "presidential action" such a confusing and illogical interpretation.

*Id.* at 28–29. On appeal, the D.C. Circuit affirmed the district court's dismissal, but did so for failure to state a claim under Fed.R.Civ.P. 12(b)(6) rather than lack of subject matter jurisdiction under Fed. R.Civ.P. 12(b)(1). *Tulare County v. Bush,* 306 F.3d 1138, 1143 (D.C.Cir.2002) ("Although Tulare County refers to the existence of foresters on the ground, the complaint does not identify these foresters' acts with sufficient specificity to state a claim."); *see also Zurich Ins. Co. v. Amcor Sunclipse North America,* 241 F.3d 605, 608 (7th Cir.2001) ("The district court's opinion … has negligible authority … because the court of appeals went out of its way to … decide[ ] the appeal on other grounds …"); *R.C.M. Executive Gallery Corp. v. Rols Capital Co.,* 901 F.Supp. 630, 637 (S.D.N.Y.1995). With respect to the question of jurisdiction, the D.C. Circuit noted that "Presidential actions, of course, are not subject to APA review," but then

indicated that Tulare County might have, had it stated its claim with sufficient specificity, "overcome this bar by challenging the non-presidential actions of the Forest Service, referring to two Forest Service documents—an internal Forest Service memorandum interpreting the Proclamation and an interim plan that directs the day-to-day management of the Monument—allegedly showing that the Service is not acting consistently with the Proclamation." *Id.*

■ In *Tulare County,* however, the plaintiff sought judicial review of its claims that the U.S. Forest Service's management plan for the Grand Sequoia National Monument *violated NEPA and NFMA,* not the presidential proclamation itself, because the Forest Service's management plan failed to comply with directives in the proclamation. *Id.* at 1143; *see also Kane County Utah v. Salazar,* 562 F.3d 1077, 1082 (10th Cir.2009) (plaintiff's claim under the APA sought declaration that agency action violated FLPMA, not the monument proclamation). As the D.C. Circuit noted, review of agency action or inaction is routinely available when the *underlying statutes,* such as NEPA or NFMA, contain no private right of action. *Tulare County,* 306 F.3d at 1143 ("Neither NFMA nor NEPA provides a cause of action, so the claims must be brought under the [APA]."); *see, e.g., Chrysler Corp. v. Brown,* 441 U.S. 281, 317–19, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (it is not necessary to find a private right of action under a particular statute in order to enforce a federal agency's compliance with that statute under the APA); *Native Ecosystems Council v. U.S. Forest Service,* 428 F.3d 1233, 1238 (9th Cir.2005) ("Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the Administrative Procedure

Act."); *Oregon Natural Resources Council Fund v. Brong,* 492 F.3d 1120, 1124 (9th Cir.2007) (agency action that allegedly violates the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701 *et seq.,* is reviewed under the APA). That, however, is not the issue here. In this case, WWP seeks judicial review under the APA of claims that the BLM's failure to act in accordance with Proclamation No. 7397's directives to the BLM to make a grazing compatibility determination and prepare a management plan for the Sonoran Desert National Monument *violates the monument proclamation itself.*[2]

### iii. Two Possible Avenues of Review

In certain circumstances, judicial review is available under the Administrative Procedures Act to challenge final agency action or inaction that allegedly violates executive orders and presidential proclamations.[3] Specifically, in *City of Carmel–By–The–Sea v. U.S. Dept. of Transp.,* the Ninth Circuit held that "[u]nder certain circumstances, Executive Orders, with specific statutory foundation, are treated as agency action and reviewed under the Administrative Procedure Act."

123 F.3d 1142, 1166 (9th Cir.1997); *see City of Albuquerque v. U.S. Dept. Of Interior,* 379 F.3d 901, 913 (10th Cir.2004) ("If an executive order has a specific statutory foundation it is given the effect of a congressional statute."); *Indep. Meat Packers Ass'n v. Butz,* 526 F.2d 228, 234 (8th Cir. 1975) (same). The Ninth Circuit defines those "certain circumstances" as executive orders that set objective standards and do not preclude judicial review. *City of Carmel–By–The–Sea,* 123 F.3d at 1166 ("The Executive Orders here do not preclude judicial review and there is 'law to apply,' as these Executive Orders set objective standards.").

There appear to be two ways in which agency action taken pursuant to an executive order or presidential proclamation may be subject to judicial review under the APA: (1) where Congress explicitly delegates authority to the President to issue directives to an agency, or (2) where the agency directives in a presidential order or proclamation "rest upon statute," i.e., the directives are issued in accordance with or in furtherance of agency action that is specifically authorized or required by statute. *LASAC v. Brennan,*

---

2. The Court emphasizes that this is a unique case; it is one of first impression. The Court has discovered no case in which the plaintiff's claims for relief were asserted solely under a presidential proclamation, as opposed to statutes that imposed independent statutory obligations on agencies. The only other case in which the plaintiff asserted a claim for relief directly under a proclamation appears to be *California ex rel. Lockyer v. U.S. Forest Service,* 465 F.Supp.2d 917 (N.D.Cal.2006). However, there, the district court explicitly declined to consider the plaintiff's "purported[ ] claim under the [APA], alleging that '[t]he Forest Service's failure to comply with the Proclamation constitutes arbitrary and capricious agency action," as the plaintiff had also asserted a claim under NEPA; "the Court will address these arguments only under NEPA." *Id.* at 923 n. 2.

3. For purposes of judicial review under the APA, WWP assumes that proclamations and executive orders are functionally equivalent. *Indep. Meat Packers Ass'n v. Butz,* 526 F.2d 228, 234 (8th Cir.1975) ("Presidential proclamations and [executive] orders have the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress.") (citations omitted). The BLM does not contest this issue. Indeed, both presidential proclamations and executive orders can be issued pursuant to the President's congressionally delegated authority, *compare* Executive Order No. 12072 *with* Proclamation No. 7397, or pursuant to the President's authority under the Constitution and laws of the United States, *compare* Executive Order No. 11988 *with* Proclamation No. 5030.

608 F.2d 1319, 1330 n. 15 (9th Cir.1979). *Compare City of Albuquerque,* 379 F.3d at 913–14 (agency action taken pursuant to Executive Order No. 12072 was subject to judicial review under the APA because Congress specifically delegated to the President the authority to "prescribe such policies and directives" pursuant to the Federal Property and Administrative Services Act of 1949 ("FPASA"), as amended, 40 U.S.C. § 486(a)) *with City of Carmel-By–The–Sea,* 123 F.3d at 1166 (agency compliance with Executive Orders No. 11988 and 11990 were subject to judicial review under the APA because the executive orders rested on, i.e., were issued in furtherance of, among other statutes, the National Environmental Policy Act of 1969 ("NEPA"), as amended, 42 U.S.C. § 4321 *et seq.,* which required the Federal Highway Administration to issue an environmental impact statement despite the fact that NEPA, unlike FPASA, does not specifically delegate to the President the authority to issue directives concerning agency action). WWP argues that presidential proclamations issued pursuant to the authority delegated to the President under the Antiquities Act, and any management directives contained therein, are subject to judicial review under the APA. In other words, according to WWP, the Antiquities Act specifically delegates to the President the authority to issue directives in monument proclamations and thus provides the specific statutory foundation necessary for

a proclamation's directives to be "given the effect of a congressional statute." [4] *City of Albuquerque,* 379 F.3d at 913.

The Antiquities Act constitutes an express, broad delegation of authority to the President. *See Mountain States Legal Foundation,* 306 F.3d at 1135 ("The Supreme Court has considered the Antiquities Act in three cases, each time confirming the broad power delegated to the President under the Act.") (citations omitted); *California,* 436 U.S. at 36, 98 S.Ct. 1662 (holding that whether federal lands are included within a national monument raises "a question only of Presidential intent, not of Presidential power"); *Cappaert v. United States,* 426 U.S. 128, 141–42, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976) (rejecting the plaintiff's claim that the President may use the Antiquities Act "only to protect archeological resources"; holding instead that the Act, by also authorizing the President to proclaim as national monuments "objects of historic or scientific interest," authorized the President to reserve as part of the monument "[t]he [underground] pool in Devil's Hole and its rare inhabitants"). "The Antiquities Act of 1906 permits the President, 'in his discretion,' to create a national monument and reserve land for its use simply by issuing a proclamation with respect to land 'owned or controlled by the Government of the United States.'" *United States v. California,* 436 U.S. 32, 40, 98

4. The BLM does not appear to contest WWP's assertion that a proclamation's directives are a valid exercise of the President's broad discretion under the Antiquities Act. However, the BLM contends that its failure to comply with Proclamation No. 7397's directives are not subject to judicial review because the agency action that WWP challenges are agency actions taken (or not taken) pursuant to directives issued in the proclamation itself; the BLM does not have any statutory obligation to act. But per *City of Albuquerque,* 379 F.3d at 913, if a proclamation's directives are in fact issued pursuant to authority delegated to the President under the Antiquities Act, then the directives would presumably be given the effect of a congressional statute, requiring agency action. And when an agency fails to comply with a statutory obligation, judicial review of that final agency action or inaction is generally available under the APA. *See SUWA,* 542 U.S. at 64, 124 S.Ct. 2373 ("[A] claim under § 706(1) can proceed [ ] where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.").

S.Ct. 1662, 56 L.Ed.2d 94 (1978) (quoting 16 U.S.C. § 431 (1976 ed.)). The only limitation placed on the President's authority to reserve federal land for the creation of national monuments by the Antiquities Act is that the "parcels of land" reserved must "be confined to the smallest area compatible with the proper care and management of the objects to be protected." 16 U.S.C. § 431; *see generally Mountain States Legal Foundation*, 306 F.3d at 1135–37; Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L.Rev. 473 (2003).

In addition, it has become widespread practice for the President to issue restrictions on the use and management of the federal lands reserved for the creation of national monuments. *See, e.g.*, Proclamation No. 1313, 39 Stat. 1752 (1915); Proclamation No. 1608, 42 Stat. 2249 (1921); Proclamation No. 1664, 43 Stat. 1913 (1923); Proclamation No. 2246, 50 Stat. 1856 (1937); Proclamation No. 3467, 76 Stat. 1465 (1962); Proclamation No. 4619, 93 Stat. 1460 (1978); Proclamation No. 7295, 3 C.F.R. 60 (2001); Proclamation No. 7397, 66 Fed.Reg. 7354 (2001); Proclamation 8031, 71 Fed.Reg. 36443, 36444 (2006), as amended by 72 Fed.Reg. 10031 (2007). WWP argues that the Antiquities Act authorizes the President to issue such restrictions and directives. In addition, the President's "long-continued practice, known to and acquiesced in by Congress" of issuing management directives in proclamations issued pursuant to the Antiquities Act, arguably "raise[s] a presumption that the [action] had been [taken] in pursuance of its consent . . . ." *United States v. Midwest Oil Co.*, 236 U.S. 459, 474, 35 S.Ct. 309, 59 L.Ed. 673 (1915); *see also Dames & Moore v. Regan*, 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *AFL–CIO v. Kahn*, 618 F.2d 784, 790 (D.C.Cir.1979) ("[T]he President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting Congressional reversal, it is entitled to great respect.") (internal quotation marks omitted).

However, where the authorizing statute or another statute does not place discernible limits on the President's discretion to issue directives to agencies, judicial review of agency action taken pursuant to those directives is generally unavailable. *See Dalton*, 511 U.S. at 474, 114 S.Ct. 1719 ("[APA] review is not available when the statute commits the decision to the discretion of the President."); *see Mountain States Legal Found.*, 306 F.3d at 1136 ("A somewhat different case is presented, however, where the authorizing statute or another statute places discernible limits on the President's discretion."). *See generally Mistretta v. United States*, 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("So long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power.") (internal quotation marks and alterations omitted). But the Antiquities Act does not appear to place limits on the President's apparent discretion to issue directives concerning the management of federal land reserved under the Act; it merely mentions the "proper care and management of the objects to be protected" in the context of limiting the President's authority to reserve land under the Act. *See California*, 436 U.S. at 40, 98 S.Ct. 1662 ("A reservation under the Antiquities Act [ ] means no more than that the land is shifted from one federal use, and perhaps from one federal managing agency, to another."). Then again, subsequent statutes concerning the use and management of federal land, including FLPMA, NFMA, the Taylor Grazing Act

of 1934, 43 U.S.C. § 315, NEPA, the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq.*, and the Public Rangelands Improvement Act of 1978, 43 U.S.C. §§ 1901–1908, do appear to place discernible limits on the President's apparent discretion to issue directives in proclamations for the use and management of federal land in national monuments created pursuant to the Antiquities Act.

WWP cites to *California ex rel. Lockyer*, 465 F.Supp.2d 917, for the proposition that agency action or inaction taken pursuant to directives in a proclamation is necessarily subject to judicial review under the APA when the proclamation is issued pursuant to the Antiquities Act. But in that case, although the plaintiff brought a claim under the APA that the U.S. Forest Service failed to comply with directives contained within the Grand Sequoia National Monument Proclamation, the district court explicitly declined to decide whether such a claim was directly subject to review under the APA. *Id.* at 923 n. 2 ("[T]he Court will address these arguments only *under NEPA.*"); *see also Tulare County*, 306 F.3d at 1143 (APA review was available for *NEPA and NFMA claims* to ensure agency action complied with directives in monument proclamation); *Sierra Club v. Bosworth*, 465 F.Supp.2d 931, 935 (N.D.Cal.2006) (subjecting *NEPA claim* to APA review and addressing agency's compliance with proclamation's directives). The court specifically held that "the Forest Service failed to comply *with NEPA* in preparing a management plan for the Grand Sequoia National Monument as required by the Presidential Proclamation." *California ex rel. Lockyer*, 465 F.Supp.2d at 931 (emphasis added).

Thus, it appears that in *California ex rel. Lockyer*, it was NEPA, not the proclamation, that provided the statutory hook to subject agency action or inaction to judicial review under the APA, whereas here WWP does not similarly claim that the BLM violated a specific statute, such as FLPMA, but Proclamation No. 7397 itself. WWP believes that distinction is irrelevant, or at the very least unpersuasive, arguing as such: the proclamation requires agency action; the proclamation was issued pursuant to the Antiquities Act which delegates to the President the authority to issue directives to agencies; the proclamation is thus given the effect of a congressional statute requiring agency action, and so final agency action or inaction pursuant to those directives are subject to judicial review under the APA. In other words, WWP argues that the court in *California ex rel. Lockyer* was able to enforce compliance with the proclamation's directives only because the proclamation carried the force and effect of law, i.e., was given the effect of a congressional statute; so the court could have held that the agency failed to comply with the proclamation itself rather than NEPA. That argument appears to be sound to the extent that the Antiquities Act does in fact delegate to the President the authority to issue directives to agencies in proclamations and the directives are thus given the effect of a congressional statute.

 The court, however, need not determine that issue as an executive order or presidential proclamation may also be subject to judicial review under the APA and treated as agency action when the order or proclamation "rests upon statute." *See, e.g., LASAC*, 608 F.2d at 1330 n. 15. Executive orders directing the actions of agencies are generally issued by the President in accordance with his or her authority under "the Constitution and statutes of the United States of America." *See, e.g.,* Exec. Order No. 11990, 42 FR 26961 (1977); Exec. Order No. 11988, 42 FR 26951 (1977); Exec. Order No. 11246, 30

FR 12319, 12935 (1965); *see also Utah Ass'n of Counties*, 316 F.Supp.2d at 1184 ("The use of executive orders may be employed by the President in carrying out his constitutional obligation to see that the laws are faithfully executed and to delegate certain of his duties to other executive branch officials, but an executive order cannot impose legal requirements on the executive branch that are inconsistent with the express will of Congress."). In the absence of an express delegation of authority to the President, judicial review of agency action taken pursuant to an executive order is available under the APA as long as the order directs an agency to take action in furtherance of the agency's independent statutory obligation. Similarly, analogizing an executive order directing agency action to agency directives in a presidential proclamation, judicial review of agency action or inaction taken pursuant to a proclamation's directives is available under the APA as long as the directives are issued in furtherance of the agency's independent statutory obligation.

 The BLM is authorized to manage federal lands under, among other statutes, FLPMA. FLPMA requires the BLM, among other things, to "develop, maintain, and, when appropriate, revise land use plans." 43 U.S.C. § 1712(a); ·*see Oregon Natural Resources Council Fund*, 492 F.3d at 1125 ("The process for developing, maintaining, and revising resource management plans is controlled by federal regulations at 43 C.F.R. §§ 1601.0–1610.8 (2006)."); *see also* 43 U.S.C. § 1701(b) ("The policies of this Act shall become effective only as *specific statutory authority* for their implementation is [sic] enacted by this Act or subsequent legislation …") (emphasis added). In addition, the BLM manages grazing on federal land in accordance with FLPMA, the Taylor Grazing Act of 1934, 43 U.S.C. § 315, NEPA, the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq.*, and the Public Rangelands

Improvement Act of 1978, 43 U.S.C. §§ 1901–1908. These statutes, and in particular FLPMA, appear to constitute the "specific statutory foundation" or independent statutory obligation for the BLM to manage federal land, and specifically here, the enabling statute for the BLM to comply with Proclamation No. 7397's directives to make a grazing compatibility determination and prepare a management plan for the Sonoran Desert National Monument. Therefore, if a monument proclamation directing certain agency action is issued in furtherance of an agency's existing statutory obligation for related agency action (FLPMA for directives concerning management plans; FLPMA and the Taylor Grazing Act, among others, for grazing compatibility determinations), then agency action or inaction in violation of the proclamation is subject to judicial review under the APA; the directives must be sufficiently related to the agency's grant of authority from Congress to have the force of law. *See LASAC*, 608 F.2d at 1330 n. 14.

In *City of Carmel–By–The–Sea*, the Ninth Circuit held that both Executive Order 11990 and 11988 were subject to judicial review under the APA; both orders issued directives "in furtherance of," among other statutes, NEPA. 123 F.3d at 1166–67. Thus, NEPA and the other listed statutes provided the "specific statutory foundation" to subject the agency action taken pursuant to the Executive Orders' directives to judicial review under the APA. *See also Southern Utah Wilderness Alliance v. Sierra*, 2008 WL 4643003, at *3 n. 3 (D.Utah 2008) (holding that Executive Orders 11644 and 11989 "may be enforced under the APA because … they have specific statutory foundation"; both orders were issued "in furtherance of" NEPA). In addition, in *LASAC*, the Ninth Circuit held that provisions of Executive Order No. 11246 were subject to judicial review under the APA because, among other

things (e.g., subsequent congressional ratification of the essential features of the order), the provisions were "sufficiently rooted in a grant of authority from Congress to have the force of law"; "Executive Order 11246 rests upon statutory and other congressional authorization." 608 F.2d at 1330 n. 14, n. 15. Further, in reviewing the President's authority to set aside federal land under the Antiquities Act, the Supreme Court noted that the Devil's Hole National Monument Proclamation relied on the National Park Service Act, 16 U.S.C. §§ 1–3, which specifically cites the statutory authority for the Director of the National Park Service to manage federal land. 426 U.S. 128, 140–41, 96 S.Ct. 2062 (1976) ("Also explicit in the 1952 Proclamation is the authority of the Director of the Park Service to manage the lands of Devil's Hole Monument 'as provided in the act of Congress entitled 'An Act to establish a National Park Service' . . .' ").[5]

■ Here, Proclamation No. 7397 declares certain objects of historic and scientific interest to be the Sonoran Desert National Monument, and reserves as a part thereof, certain federal land. The Proclamation also directs the BLM to prepare a management plan and conduct a grazing compatibility determination. Those directives relate to the management of federal land (now part of the SDNM); and the BLM's authority to manage federal land is derived from, among other statutes, FLPMA. As such, it appears that

Proclamation No. 7397's directives may be judicially enforceable if they rest on or are issued in furtherance of FLPMA; if FLPMA constitutes the statutory foundation for the agency action directed by the Proclamation.

Proclamation No. 7397's agency directives do not, however, explicitly refer to FLPMA or other statutory authority. The Proclamation merely states that its directives to the BLM are issued "pursuant to applicable legal authorities." Proc. No. 7397, 66 FR at 7356. Nevertheless, since the directives are related to the BLM's management of federal land, and the BLM manages federal land pursuant to FLPMA, the only reasonable conclusion is that the directives are issued in furtherance of (or in accordance with) FLPMA; the directives rely on the BLM's independent statutory obligations under FLPMA. Thus, FLPMA appears to constitute the specific statutory foundation necessary to supply APA review of Proclamation No. 7397's directives to the BLM to prepare a monument plan and conduct a grazing compatibility determination. *See Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n. 1 (5th Cir.1967) (although Exec. Order No. 10925 did not explicitly cite to the FPASA, the Fifth Circuit was "hesitant to say that the antidiscrimination provisions of Exec. Order No. 10925 are so unrelated to [the FPASA] that the order should be treated as issued without statutory authority."); *but see Indep. Meat*

---

5. *City of Albuquerque* involved both delegated authority and congressional authorization for related agency action. There the Tenth Circuit held that Executive Order No. 12072's directives to the Administrator of General Services were subject to judicial review because the order was issued under the "authority vested in [the] President of the United States of America by Section 205(a) of the [FPASA]," which specifically delegated to the President the authority to "prescribe policies and directives that the President considers

necessary to carry out [the FPASA]." 379 F.3d at 914. The FPASA, however, also authorized the Administrator to prescribe regulations to carry out the FPASA, and thus constituted the specific statutory foundation or independent statutory obligation on which the directives in Executive Order 12072 could rely. FPASA thus provided the foundation for both the issuance and enforcement of the executive order and the directives contained therein.

*Packers*, 526 F.2d at 235–36 (holding that Exec. Order No. 11821 was not subject to judicial review under the APA because it "cite[d] no specific source of authority other than the 'Constitution and laws of the United States,'" and thus "was intended primarily as a managerial tool for implementing the President's personal economic policies and not as a legal framework enforceable by private civil action.").

Although there are times when a court may be unable to divine the statutory foundation relied on by an executive order or proclamation's directives because the order or directives fail to explicitly refer to the agency's independent statutory obligation on which the order or directives rely, *see Indep. Meat Packers*, 526 F.2d at 235–36, to find that here would result in holding Proclamation No. 7397's directives are not subject to review under the APA because of a technicality. That, the Court declines to do. *See, e.g., Heckler*, 470 U.S. at 843, 105 S.Ct. 1649 ("[T]he APA presumptively entitles any person 'adversely affected or aggrieved by agency action,' 5 U.S.C. 702—which is defined to include the 'failure to act,' 5 U.S.C. 551(13)—to judicial review of that action.") (Marshall, J., concurring); *McAlpine*, 112 F.3d at 1432 ("[T]he APA establishes a *strong presumption in favor of reviewability* of agency action.") (emphasis in original). Therefore, as the directives in Proclamation No. 7397 rely on "all applicable legal authorities," which in the context the BLM' management of federal land necessarily refers to the BLM's independent statutory obligation under FLPMA, the Court concludes that Proclamation No. 7397's directives rely on specific statutory authority sufficient to subject agency action or inaction taken in accordance with those directives to judicial review under the APA.

 In addition, Proclamation No. 7397 contains "law to apply." *See City of Carmel–By–The–Sea*, 123 F.3d at 1166.

"[J]udicial review [is] limited to the non-discretionary aspects of agency action." *LASAC*, 608 F.2d at 1330; *City of Albuquerque*, 379 F.3d at 916–17. Thus, to be subject to judicial review, a proclamation's directives must "identify in clear mandatory terms" the agency action that must be taken. *Id.* Here, Proclamation No. 7397's directives are explicit: 1) "all motorized and mechanized vehicle use off road will be prohibited, except for emergency or authorized administrative purposes"; 2) "the Secretary of the Interior shall prepare a management plan that addresses the actions, including road closures or travel restrictions, necessary to protect the objects identified in this proclamation"; 3) "grazing permits on Federal lands within the monument south of Interstate Highway 8 shall not be renewed at the end of their current term"; and 4) "grazing on Federal lands north of Interstate 8 shall be allowed to continue only to the extent that the [BLM] determines that grazing is compatible with the paramount purpose of protecting the objects identified in this proclamation." Proc. No. 7397, 66 Fed.Reg. at 7356. Those directives, as well as the standards set forth in FLPMA and other applicable statutes concerning the BLM's management of federal lands, are sufficiently specific and objective to subject agency action or inaction taken in violation of Proclamation No. 7397 to judicial review under the APA.

## C. Section 325 & the Renewal of Grazing Permits

The BLM also argues that Section 325 of the Department of the Interior and Related Agencies Appropriations Act of 2004 bars WWP's claims relating to the grazing compatibility determination and BLM's renewal of grazing permits on the Sonoran Desert National Monument.

Section 325 requires the BLM to renew under FLPMA all grazing permits and leases set to expire during fiscal years 2004–2008 until such time as the BLM is able to fully process the permits in compliance with "all applicable laws and regulations." Pub.L. No. 108–108, 117 Stat. 1241, § 325 (Nov. 10, 2003). Section 325 also leaves to the Secretary the "sole discretion [to] determine the priority and timing for completing [the] required environmental analysis of grazing allotments based on the environmental significance of the allotments and funding available to the [BLM] for this purpose." *Id.*

First, WWP contends that the language in Section 325 concerning "all applicable laws and regulations" and "required environmental analysis" refers only to "procedural laws such as NEPA." (Dkt. # 32, p. 8). Second, WWP points to the fact that Section 325 requires that grazing permits are to be renewed under Section 402 of FLPMA, 43 U.S.C. § 1752, which states that permits issued for livestock grazing on public lands must be "consistent with the governing law," and that "[n]othing in [Section 325] shall be deemed to alter the statutory authority of the Secretary of the Interior ...." Pub.L. No. 108–108, 117 Stat. 1241, § 325. Finally, WWP argues that "[h]ad Congress intended to repeal or suspend all environmental laws, it easily could have done so—such as by including the phrase 'notwithstanding any other provision of law' as it did in other sections of the 2004 Interior appropriations bill, but not in Section 325." (Dkt. # 32, p. 6).

■ However, WWP's interpretation of Section 325 cannot be easily squared with its text. While WWP is correct that "[r]epeals (or suspension) of legislation by implication are disfavored, especially 'when the claimed repeal rests solely on an Appropriations Act,'" *Forest Guardians v. Babbitt,* 174 F.3d 1178, 1192 (10th Cir. 1999) (quoting *Tennessee Valley Authority*

*v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)), in enacting Section 325 "Congress unequivocally required the Secretary of the Interior to renew any expired, transferred or ... waived grazing permit whatever the Secretary's progress in 'processing ... such permit ... in compliance with all applicable laws and regulations.'" *Great Old Broads For Wilderness v. Kempthorne,* 452 F.Supp.2d 71, 80–81 (D.D.C.2006) (quoting Pub.L. No. 106–113, § 123, 113 Stat. at 1501A–159). In *Oregon Natural Desert Association v. United States Forest Service,* the district court held that "[t]he NEPA requirement for re-issuing a grazing permit has been held in abeyance by Congress with instruction to federal agencies to work on reducing the backlog of NEPA analysis." 2005 WL 1334459, at *12 (D.Or.2005) ("ONDA I"). A subsequent ruling from the District of Oregon affirmed that holding, similarly stating that under Section 325, "Congress provided for continued grazing on permitted federal allotments under otherwise invalid grazing permits by withholding the need for the requisite NEPA analysis upon the re-issuance of a grazing permit." *Oregon Natural Desert Association v. United States Forest Service,* 2005 WL 1459328, at *9 (D.Or.2005) ("ONDA II"). As such, WWP asserts that Section 325 only tolls requirements under NEPA and other procedural laws. But the *ONDA* cases do not support that assertion; they do not restrict the tolling language concerning "all applicable laws and regulations" and "required environmental analysis" to "procedural laws such as NEPA."

In addition, *Forest Guardians v. Veneman* does not support WWP's interpretation and application of Section 325. 305 F.Supp.2d 1118 (D.Ariz.2003). In that case, the district court held that despite the requirement in Section 504 of the Rescissions Act of 1995 that "[n]otwithstanding any other law" grazing permits must

be renewed despite failure to complete the required analysis under "NEPA and other applicable laws," Section 504 did not constitute a broad exemption from all environmental laws that might on their own require modification of the permits. 305 F.Supp.2d at 1121 (quoting Recessions Act § 504, Pub.L. No. 104–19, 109 Stat. 194, 212 (July 27, 1995)). The district court also held that "[t]he Recessions Act did not suspend Defendant's duty to comply with the ESA ..." *Id.* In other words, *Forest Guardians* held that Section 504 neither exempted nor suspended the Forest Service's duty to comply with relevant environmental laws. Instead, the court held that "[t]he Recessions Act only provides a limited grace period of validity for grazing permits that expire and must be renewed prior to the relevant environmental (NEPA or ESA) analysis being completed." *Id.* at 1122.

Similarly, here Section 325 does not constitute a broad exemption from all environmental laws that might on their own require modification of grazing permits. Neither does Section 325 completely suspend the BLM's duty to comply with directives in Proclamation No. 7397 to issue a grazing compatibility determination. Like *Forest Guardians,* Section 325 merely provides a limited grace period of validity for grazing permits that expire and must be renewed prior to the relevant environmental analysis, such as the compatibility determination, being completed.[6] This temporary tolling is confirmed by the fact that Section 325 specifically states that permits "may be canceled, suspended or modified ... to meet the requirements of such applicable laws and regulations" once the processing of the permits is complete. Pub.L. No. 108–108, 117 Stat. 1241,

§ 325. In essence, Section 325 changes the relevant environmental analysis that applies to grazing permits from a condition precedent into a potential condition subsequent; the analysis still has to occur, but for the time being, not prior to renewal of the permits.

 In *Western Watersheds Project v. Bennett,* however, the court held that appropriations riders such as Section 325 do not "divest [the] Court of jurisdiction to apply FLPMA" because the renewals are to be made pursuant to FLPMA, which in turn states that renewals must be "consistent with the governing law." 2008 WL 2003114, at *7 (D.Idaho 2008). The court based its holding on an earlier finding with respect to Section 142 of the 2004 Interior appropriations bill, stating that "[b]oth riders contain identical language that renewals are issued pursuant to 'Section 402 of [FLPMA] and section 3 of the Taylor Grazing Act ...'" *Id.* But Section 142 is not identical to Section 325. In fact, although Sections 142 and 325 contain some similar language, not only does Section 325 not mention the Taylor Grazing Act of 1934, but Section 142 does not contain language concerning the tolling of "all applicable laws and regulations" with respect to the renewal of grazing permits on federal land. Furthermore, if the Court were to accept WWP's argument and the district court's holding in *Western Watersheds,* then Section 325 would present the BLM with "the choice of (1) acting unlawfully by renewing the relevant permits and thereby violating [the Proclamation]; or (2) acting unlawfully by delaying renewal of the relevant permits to allow compliance with [the Proclamation], and thereby violating [Section 325]." *Great Old Broads,*

---

6. Under Section 325, the "limited grace period" is fiscal years 2004–2008. Pub.L. No. 108–108, 117 Stat. 1241, § 325. However, the Court recognizes WWP's frustration that

that "limited" period has consistently been extended by Congress through appropriations riders since the Monument's inception in 2001.

452 F.Supp.2d at 81. As the district court stated in *Great Old Broads,* however, "[t]his makes no sense. Through the enactment of the riders, Congress amended 'all applicable laws' to require reissuance of expired, transferred or waived grazing permits prior to the completion of otherwise required actions." *Id.* Accordingly, the Court holds that Section 325 bars WWP's claims relating to the BLM's renewal and processing of existing grazing permits on the Sonoran Desert National Monument.

In the alternative, WWP argues that Section 325 does not apply to its claim of unreasonable delay and unlawful withholding of the compatibility determination and management plan because Section 325 applies only to the processing of grazing permits, whereas the compatibility determination and management plan "do not equate to the routine processing of individual grazing permits contemplated by the rider." (Dkt. # 32, p. 9). To the extent, however, that the grazing compatibility determination constitutes a precondition to the processing of grazing permits (i.e., if grazing is found to be incompatible with protecting the objects identified in the proclamation, then grazing may not continue), it does in fact appear to relate to Section 325's requirement that the BLM reissue all expired, transferred or waived grazing permits prior to completion of the processing of the permits in accordance with "all applicable laws and regulations" and the "required environmental analysis." In addition, Section 325 provides the Secretary of the Interior with the "sole discretion" to "determine the priority and timing for completing required environmental analysis of grazing allotments based on the environmental significance of the allotments ...." Pub.L. No. 108–108, § 325. Thus, to the extent a grazing compatibility determination constitutes an "environmental analysis of grazing allotments based on the environmental significance of the allot-

ments," Section 325 bars WWP's claim for unreasonable delay and/or unlawful withholding of the compatibility determination.

■ On the other hand, the preparation of a management plan does not appear to amount to condition precedent to the renewal of grazing permits on the SDNM, and thus is not barred by Section 325. Proclamation No. 7397's directive concerning the preparation of a management plan requires only that "[t]he Secretary of the Interior shall prepare a management plan that addresses the actions, including road closures or travel restrictions, necessary to protect the objects identified in [the] proclamation." Proc. No. 7397, 66 Fed.Reg. at 7356. It does not appear as though enforcing that directive on the BLM would prevent the agency from renewing any existing grazing permits on the monument as required under Section 325. Therefore, as Proclamation No. 7397 is subject to judicial review under the APA, and Section 325 does not appear to bar review of the BLM's failure to, at the very least, *prepare* a management plan in accordance with the directives in Proclamation No. 7397, WWP may proceed on its claim against the BLM.

■ Finally, WWP argues that "because the rider only addresses renewal of grazing permits, WWP's challenges to BLM's annual authorizations are obviously not barred by the rider. Those annual grazing authorizations are final agency actions that can be challenged independent of the permit renewals." (Dkt. # 32, p. 11). An annual grazing authorization is "the consummation of a process that sets the parameters for the upcoming grazing season and [ ] imposes legal consequences on the permit holder." *Oregon Natural Desert Association v. United States Forest Service,* 465 F.3d 977, 983 (9th Cir.2006). It is uncontested that such authorizations are final agency action. *Id.* at 986 ("[A]n [annual operating instruction] is a final

agency action subject to judicial review under § 706(2)(A) of the APA.").

But annual grazing authorizations are an integral part of the permitting process, as such authorizations are "responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the [ ] grazing permit, such as drought conditions, timing and duration of rainfall over the grazing season, success or failure of habitat restoration projects, water quality, or degree of risk to threatened or endangered species affected by grazing." *Id.* at 980–81. As such, the Court agrees with the BLM that "[i]n applying Section 325, it would make no sense to allow BLM to renew permits before completing required analyses, but then subject annual authorizations to injunctions. Such an application would subvert the purpose of Section 325." (Dkt. # 34, p. 11). Furthermore, Section 325's delegation to the Secretary of the Interior the "sole discretion" to "determine the priority and timing for completing required environmental analysis of grazing allotments," would seem to apply as equally to annual authorizations as it does to the renewal of grazing permits. Pub.L. No. 108–108, § 325. Therefore, the Court holds that Section 325 applies equally to bar claims related to both grazing permits and annual authorizations.

**Accordingly,**

**IT IS HEREBY ORDERED** granting in part and denying in part the BLM's Motion to Dismiss. (Dkt. # 25). WWP's second claim for relief is dismissed. In addition, WWP may proceed on its first claim for relief against the BLM only to the extent WWP alleges a violation of the Sonoran Desert National Monument Proclamation for failure to issue a management plan for the Monument. (FAC ¶ 72(B)).

**IT IS FURTHER ORDERED** that WWP may, if necessary in light of the instant order, file a motion for leave to file a Second Amended Complaint to state an additional claim(s) under FLPMA. WWP must file its motion no later than 30 days after entry of this order.